GEORGE C. HARRIS (CA SBN 111074)
GHarris@mofo.com
JUSTIN D. HOOGS (CA SBN 267699)
JHoogs@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California 94105-2482
Telephone:  (415) 268-7000
Facsimile:  (415) 268-7522

CARL H. LOEWENSON, JR. (*pro hac vice*)
CLoewenson@mofo.com
MORRISON & FOERSTER LLP
250 West 55th Street
New York, New York 10019-9601
Telephone:  (212) 468-8000
Facsimile:  (212) 468-7900

Attorneys for Defendant
MAHER F. KARA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.    09-CR-00417-EMC |
| Plaintiff, | **SENTENCING MEMORANDUM** |
| v. | |
| MAHER FAYEZ KARA, *et al.*, | |
| Defendants. | |

1

# TABLE OF CONTENTS

2

**Page**

3   I.      INTRODUCTION ............................................................................................... 1

4   II.     A PROBATIONARY SENTENCE WITHOUT HOME CONFINEMENT IS
           APPROPRIATE............................................................................................... 4

5

6           A.    Maher Kara's History and Characteristics ......................................... 5

7                 1.    Maher's childhood and youth .................................................. 5

8                 2.    Maher's relationship with his family and his brother Michael ............... 7

9                 3.    Maher's career, marriage, and children.................................... 11

10          B.    The Nature and Circumstances of Maher's Offense ......................... 16

11                1.    Maher's participation in the insider trading scheme ............................. 16

12                      a.    United Surgical Partners International ...................................... 17

13                      b.    Biosite ................................................................. 19

14                2.    Maher's extraordinary cooperation ....................................... 20

15          C.    Under the Circumstances of This Case, a Probationary Sentence Without
                 Home Confinement Will:.............................................................. 23

16                1.    Reflect the seriousness of the offense, promote respect for the law, and
                       provide just punishment. ........................................................... 23

17                2.    Afford adequate deterrence to criminal conduct.................................. 30

18                3.    Protect the public from future crimes.................................... 31

19                4.    Provide Maher with needed educational or vocational training, medical
                       care, or other correctional treatment in the most effective manner........ 32

20

21          D.    The Kinds of Sentences Available ................................................. 32

22          E.    The Advisory Guideline Range........................................................... 32

23                1.    The Sentencing Guidelines calculation .................................. 32

24                2.    The Obstruction Adjustment does not apply......................................... 36

25                      a.    The Scope of the Obstruction Adjustment ................................. 36

26                      b.    Maher's unsworn false statements were "exculpatory no"
                             denials of guilt and did not significantly obstruct or impede
27                           the government's investigation ................................. 39

28          F.    Any Pertinent Policy Statement Issued by the Sentencing Commission ........... 44

**TABLE OF CONTENTS**
(continued)

Page

G.    The Need to Avoid Unwarranted Sentence Disparities ..................................... 44

    1.    Defendants in comparable insider trading cases .................................... 45

    2.    Michael Kara ....................................................................................... 50

H.    There Is No Need for a Period of Home Confinement. .................................... 51

I.    There Is No Need to Provide Restitution to Victims of the Offense. ................ 52

III.    OBJECTIONS TO PRESENTENCE REPORT ........................................................... 52

IV.    CONCLUSION ........................................................................................................ 52

1

# TABLE OF AUTHORITIES

2

**Page(s)**

3

CASES

4

5

*Gall v. United States*,
    552 U.S. 38 (2007) ........................................................................... 4, 29, 50

6

*Kimbrough v. United States*,
    552 U.S. 85 (2007) ..................................................................................... 4

7

8

*Koon v. United States*,
    518 U.S. 81 (1996) ..................................................................................... 4

9

10

*Pepper v. United States*,
    131 S. Ct. 1229 (2011) .......................................................................... 2, 4

11

*United States v. Adelson*,
    441 F. Supp. 2d 506 (S.D.N.Y. 2006) ..................................................... 30

12

13

*United States v. Ahmed*,
    324 F.3d 368 (5th Cir. 2003) ........................................................... *passim*

14

15

*United States v. Ameline*,
    400 F.3d 646 (9th Cir. 2005) ................................................................... 32

16

*United States v. Barnett*,
    939 F.2d 405 (7th Cir. 1991) ....................................................... 37, 39, 40

17

18

*United States v. Booker*,
    543 U.S. 220 (2005) ................................................................................... 4

19

20

*United States v. Carty*,
    520 F.3d 984 (9th Cir. 2008) ................................................................... 32

21

*United States v. Corsey*,
    723 F.3d 366 (2d Cir. 2013) ..................................................................... 34

22

23

*United States v. Emmenegger*,
    329 F. Supp. 2d 416 (S.D.N.Y. 2004) ..................................................... 34

24

25

*United States v. Fiala*,
    929 F.2d 285 (7th Cir. 1991) ................................................................... 37

26

*United States v. Griffin*,
    310 F.3d 1017 (7th Cir. 2002) ....................................................... 37, 38, 39

27

28

*United States v. Gupta*,
    904 F. Supp. 2d 349 (S.D.N.Y. 2012) ............................................... 30, 34

1

## TABLE OF AUTHORITIES
### (continued)

2

Page(s)

3

*United States v. Hanhardt,*
    361 F.3d 382 (7th Cir. 2004) ...................................................................... 38

4

*United States v. Kalili,*
    100 F. App'x 903 (4th Cir. 2004) ............................................................... 35

5

6

*United States v. Mora-Gomez,*
    875 F. Supp. 1208 (E.D. Va. 1995) ............................................................ 29

7

8

*United States v. Oakford Corp.,*
    No. 98-CR-144(JSR), 1999 WL 1201725 (S.D.N.Y. Dec. 13, 1999) ......... 35

9

10

*United States v. Pham,*
    545 F.3d 712 (9th Cir. 2008) ...................................................................... 38

11

*United States v. Ressam,*
    679 F.3d 1069 (9th Cir. 2012) .................................................................... 44

12

13

*United States v. Shriver,*
    967 F.2d 572 (11th Cir. 1992) .................................................................... 38

14

*United States v. Smith,*
    203 F.3d 884 (5th Cir. 2000) ................................................................. 38, 41

15

16

*United States v. Solano-Godines,*
    120 F.3d 957 (9th Cir. 1997) ...................................................................... 38

17

18

*United States v. Soto,*
    399 F. App'x 498 (11th Cir. 2010) ........................................................ 38, 41

19

*United States v. Stall,*
    581 F.3d 276 (6th Cir. 2009) ...................................................................... 29

20

21

*United States v. Surasky,*
    976 F.2d 242 (5th Cir. 1992) ................................................................. 37, 40

22

23

*United States v. Swor,*
    728 F.3d 971 (9th Cir. 2013) ...................................................................... 52

24

*United States v. Tyler,*
    767 F.2d 1350 (9th Cir. 1985) .................................................................... 52

25

26

*United States v. Zavala,*
    443 F.3d 1165 (9th Cir. 2006) .................................................................... 32

27

28

# TABLE OF AUTHORITIES
## (continued)

Page(s)

*United States v. Zolp*,
  479 F.3d 715 (9th Cir. 2007)........................................................................................... 21

**STATUTES**

15 U.S.C. § 78j(b) ................................................................................................... 1, 32

15 U.S.C. § 78ff ............................................................................................................ 1

18 U.S.C. § 371 ................................................................................................. 1, 32, 37

18 U.S.C. § 1505 ......................................................................................................... 37

18 U.S.C. § 3553(a) .............................................................................................. *passim*

18 U.S.C. § 3561(c)(1) ................................................................................................ 32

18 U.S.C. § 3664 ......................................................................................................... 52

28 U.S.C. § 991 ........................................................................................................... 44

U.S.S.G. § 2B1.1 .................................................................................................... 33, 34

U.S.S.G. § 2B1.4 ......................................................................................................... 33

U.S.S.G. § 3C1.1 ................................................................................................... *passim*

U.S.S.G. § 3E1.1 ......................................................................................................... 33

U.S.S.G. § 5K1.1 .................................................................................................... 1, 33

## I.    INTRODUCTION

Maher Kara respectfully submits this sentencing memorandum and objections to the presentence investigation report ("PSR").  Maher comes before the Court having pled guilty pursuant to a cooperation agreement to one count of conspiracy to commit securities fraud, in violation of 18 U.S.C. § 371, and one count of securities fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff.  He is subject to a statutory sentencing range of zero to five years' incarceration on count one, and zero to twenty years' incarceration on count two, both of which may be followed by up to three years of supervised release. Maher has provided substantial assistance to the government's prosecutions in related cases, including testimony in two trials that resulted in convictions; the government has moved therefore for a downward departure from the Sentencing Guidelines pursuant to U.S.S.G. § 5K1.1.  Even without consideration of Maher's cooperation and the § 5K1.1 downward departure requested by the government, the PSR recommends that Maher be sentenced to probation for three years with no condition of home confinement.  We respectfully urge the Court to follow the PSR recommendation.  Based on the totality of circumstances in this case and Maher's extraordinary cooperation, a probationary sentence is sufficient, but not greater than necessary, to satisfy the 18 U.S.C. § 3553(a) sentencing goals.

As the PSR and letters submitted on his behalf make clear, Maher is a loving and devoted father, husband, and son; a loyal friend and dedicated colleague; and a fundamentally good, generous, and hardworking person who has led an otherwise exemplary life.  Maher has fully acknowledged, including in testimony before this Court, that he made a grievous mistake for which he alone is responsible.  His offense conduct was, however, an aberrant deviation from a life of integrity and truthfulness, which took place in the context of extraordinary family demands and without any intent for personal financial gain.  It did not stem from the usual motives for insider trading—greed and status—but from pressures created by his brother's struggles with mental illness, deceptions, and pleas for help.

1    For the past nearly five years, since approaching the FBI and U.S. Attorney's

2  Office through counsel to proffer cooperation in early 2010, Maher has done everything

3  in his power to atone for his offense.  At that time and in a series of subsequent proffers,

4  Maher provided the government a full and contrite confession of his conduct and

5  complete cooperation.  He persevered in that cooperation even when, to his surprise and

6  anguish, it required him to provide grand jury and trial testimony against his brother-in-

7  law Bassam Salman and Mr. Salman's wife's brother-in-law, Karim Bayyouk.  Maher's

8  wife, Sawsan ("Susie") Kara, also met with the government at its request and was called

9  by the government to testify at Mr. Bayyouk's trial.

10    Maher's offense and prolonged cooperation have exacted a substantial toll on him

11  and his family.  His professional life and family relations are devastated.  His career as a

12  distinguished investment banker is over, and he has been unemployed since receiving an

13  SEC Wells notice in October 2008.  Maher has not spoken with his brother Mounir

14  ("Michael") Kara in more than six years.  Having grown up in a culture in which family

15  ties are of paramount importance, Maher, Susie, and their children have been completely

16  ostracized and disowned by Susie's family as a result of Maher's cooperation and

17  testimony at Susie's brother's trial.  The public shame and the knowledge that he has

18  disappointed so many people have been crushing to Maher.  Nonetheless, he has

19  responded by throwing himself wholeheartedly into the role of primary caregiver for his

20  two young children, engaging in community service, and completing a degree program in

21  a new field.

22    As discussed below, the Sentencing Guidelines, with proper downward departures

23  as recommended by the probation officer and the government, support a probationary

24  sentence without home confinement.  In addition, however, the totality of circumstances

25  in this case demonstrates why the Supreme Court rejected mandatory application of the

26  Guidelines and gave discretion to district courts "to consider every convicted person as

27  an individual and every case as a unique study in the human failings that sometimes

28  mitigate, sometimes magnify, the crime and the punishment to ensue."  *Pepper v. United*

1    *States*, 131 S. Ct. 1229, 1239–40 (2011) (internal quotation and citation omitted).

2    Consideration of the § 3553(a) statutory factors, including the need to avoid unwarranted

3    sentencing disparities, strongly supports the PSR's recommendation of a probationary

4    sentence for Maher:

5    •    Maher is a first-time offender who has led an otherwise exemplary and

6    law-abiding life;

7    •    Maher's complete acceptance of responsibility and prolonged,

8    extraordinary cooperation, at great personal cost, demonstrate his true character, in stark

9    contrast to the aberrant nature of his offense conduct;

10   •    A probationary sentence is sufficient punishment for Maher's offense

11   given the severe collateral consequences of his conduct, including the irreparable damage

12   to his career and professional reputation and the destruction of his family ties;

13   •    A probationary sentence will provide suitable inducement for potential

14   future cooperators who are often essential to discovering and prosecuting insider trading

15   cases;

16   •    A sentence of imprisonment is not needed to provide specific or general

17   deterrence;

18   •    Maher poses no risk of recidivism, and there is no need to protect the

19   public from further criminal conduct;

20   •    A probationary sentence is necessary to avoid unwarranted sentencing

21   disparities with those convicted of similar or more egregious conduct, including Maher's

22   brother, Michael, as well as countless other cooperating defendants in other insider

23   trading cases around the country; and

24   •    Maher has been for the past six years and continues to be the primary

25   caregiver for his two young children, who—along with his wife, who is the family's sole

26   income earner—would suffer greatly from his absence if he were incarcerated.

27        These and other factors discussed below make a probationary sentence a

28   punishment that is "sufficient, but not greater than necessary," to comply with the

1   statutory goals of sentencing.  18 U.S.C. § 3553(a); *see also Kimbrough v. United States*,

2   552 U.S. 85, 111 (2007).  Nor is there any need for a condition of home confinement,

3   which would merely burden Maher's efforts to seek employment and begin building a

4   new career after more than six years of suspended animation while completing his

5   cooperation and awaiting sentencing.

6   **II.     A PROBATIONARY SENTENCE WITHOUT HOME**
        **CONFINEMENT IS APPROPRIATE.**

7

8       This Court has broad discretion to sentence Maher within the sentencing ranges

9   applicable to each count and consistent with the mandate of 18 U.S.C. § 3553(a).  The

10  Sentencing Guidelines are only one of many factors to be weighed in "mak[ing] an

11  individualized assessment based on the facts presented" of what constitutes a just and

12  proper sentence.  *Gall v. United States*, 552 U.S. 38, 50 (2007).  Even before *United*

13  *States v. Booker*, 543 U.S. 220 (2005), made the Sentencing Guidelines discretionary, the

14  Supreme Court recognized that "[i]t has been uniform and constant in the federal judicial

15  tradition for the sentencing judge to consider every convicted person as an individual and

16  every case as a unique study in the human failings that sometimes mitigate, sometimes

17  magnify, the crime and the punishment to ensue."  *Koon v. United States*, 518 U.S. 81,

18  113 (1996).  "Underlying [that] tradition is the principle that the punishment should fit

19  the offender and not merely the crime."  *Pepper*, 131 S. Ct. at 1240 (internal quotations

20  and citations omitted).

21      The "overarching provision" of 18 U.S.C. § 3553(a) is to impose a sentence

22  "sufficient, but not greater than necessary," to meet the goals of sentencing established

23  by Congress.  *Kimbrough*, 552 U.S. at 101.  Those goals include "to reflect the

24  seriousness of the offense"; "to promote respect for the law"; "to provide just punishment

25  for the offense"; "to afford adequate deterrence to criminal conduct"; and "to protect the

26  public from further crimes of the defendant."  *Id.* (quoting 18 U.S.C. § 3553(a)).  Section

27  3553(a) further provides that in determining a sufficient sentence, district courts should

28  consider a number of factors, including "the history and characteristics of the defendant";

1   "the nature and circumstances of the offense"; "the sentencing range established" by the

2   sentencing guidelines; "any pertinent policy statement" issued by the Sentencing

3   Commission pursuant to its statutory authority; and "the need to avoid unwarranted

4   sentence disparities among defendants with similar records who have been found guilty

5   of similar conduct."  18 U.S.C. § 3553(a).  Where, as here, a sentence other than

6   imprisonment would be sufficient to meet the statutory goals of sentencing, the Court

7   must impose that alternative because imprisonment would be a "greater than necessary"

8   sentence.  *Id.*

9           **A.      Maher Kara's History and Characteristics**

10                  **1.      Maher's childhood and youth**

11          Maher and his family immigrated to the United States from Beirut, Lebanon, in

12   1976 when Maher was approximately five years old.  (*See* Transcript of *United States v.*

13   *Bayyouk*, No. 12-CR-420 (EMC) (N.D. Cal. Aug. 27, 2013) ("Bayyouk Tr.") at 7:11–16

14   (testimony of Maher Kara).)  At the time, Lebanon was in the midst of civil war.

15   (Bayyouk Tr. at 7:11–16.)  Maher's mother, Souad Kara, recalls that "Maher spent most

16   of his first five years living in bomb shelters and witnessing a great deal of death and

17   tragedy."  (Letter from Souad Kara.)[1]  After being fortunate enough to secure visas to the

18   United States, Maher's family, including his parents, his older brother, Michael, and his

19   sister, Maya, relocated to San Francisco.  (Bayyouk Tr. at 7:25–8:7.)

20          Maher's mother recalls that from an early age, Maher displayed an exceptional

21   empathy and concern for others:

22          Maher was an ideal child and was incredibly aware of our family struggles
            and challenges and always sought to help in any way that he could.  He
23          would pack his father lunch every morning and would wait at the window
            every night to watch his dad come home from work on the Muni bus.  He
24          would stay up with us late into the night as we worried about [Michael]
            being out too late.  Maher promised us he would never worry us or give us
25          grief.

26

27   [1] All letters referenced herein are attached to Maher's PSR.

28

(Letter from Souad Kara.)

Maher also excelled in school.  He attended St. Monica's Elementary, where he served as an altar boy for three years.  He subsequently received the four-year merit-based Mason Family Scholarship to attend St. Ignatius College Preparatory in San Francisco, where he continued to be a strong student.  (*See* Bayyouk Tr. at 9:3–5.) After graduating from high school, Maher was admitted to the University of California, Berkeley, from which he graduated in 1993.  (*See* Transcript of *United States v. Salman*, No. 11-CR-625 (EMC) (N.D. Cal. Sept. 17, 2013–Sept. 18, 2013) ("Salman Tr.") at 12:22–25 (testimony of Maher Kara).)

Growing up, Maher had no trouble with authorities; indeed, prior to this case, Maher had no issues of any kind with law enforcement.  (*See* Salman Tr. at 126:19–128:12.)  Rather, as described by a grammar school friend who has known Maher for over thirty-one years, beginning as a youth and continuing to this day Maher has cultivated and maintained a practice of helping others:

> Maher's character and upbringing have been influenced by Christian values.  These values have been strengthened by exposure [to] and practical application of theological principles learned in grammar school where he performed community service in soup kitchens.  They were further influenced at St. Ignatius College Preparatory where we were taught by the Jesuits to be "Men for Others."  Maher applied these principles by tutoring several classmates in high school and then tutored student athletes in college.  At U.C. Berkeley, he also prepared tax returns for underprivileged families in Oakland and in San Francisco's Chinatown district who could not afford or understand how to prepare their own tax returns.

(Letter from A.R.)  A college friend who has known Maher for over twenty-five years similarly describes Maher's early commitment to helping others:

> One notable thing set [Maher] strongly apart from the other students . . . and that was his empathy for people, his extraordinary patience and helpfulness towards others.  I remember several occasions on which he went well out of his way to tutor and help students who were having trouble keeping up in our classes.  Seeing him patiently explaining mathematical, statistical, economic or other things to students who were not as gifted as he was almost a staple of daily life at that time, as we met almost every day following his tutoring sessions.  Given the pressure to perform for everyone, the cutthroat attitude of many others and his own time demands, I always thought this was notable. . . . He is an

1   extraordinarily generous person, who in his actions towards others and
2   overall outlook and attitude, has something of real charity and humanity.

3   (Letter from C.G.)

4       **2.    Maher's relationship with his family and his brother**
            **Michael**

5

6       Maher's commitments to his education and to helping others were accompanied

7   by a deep commitment and devotion to meeting the needs of his family.  A college friend

8   writes:

9       I ascribed [Maher's] deep commitment to excel[l]ing in academics to his
        much deeper commitment to his family.  I knew that this was partly to
10      meet the high expectations of him, perhaps partly cultural and partly
        personal.  But I also believed that his pouring his energy into his studies
11      was an escape of sorts from his own particular demons.  I have met all the
        members of his immediate family, including his mother, father who passed
12      away several years ago, his sister and his brother.  His relationship with
        his brother, in particular, was extremely tumultuous and fraught with
13      complexity.  From what I could gather . . . Maher was placed in the very
        stressful situation of having to be a go-between, placate[r], mender, parent
14      and ambassador to or between the various members of his family, which
        was often rocked with discord stemming from the actions, behavior and
15      drug use of his brother. . . . I did not know any other students who—
        during their halcyon college introduction and acclimation to the
16      responsibilities and liberties of healthy adulthood—were so entwined with
        these incessant familial demands which always grabbed them by the nape
17      of the neck to pull them back into a series of upsets.  However much
        Maher obviously loved his family (they were always his first priority),
18      their demands upon him—unwitting or not—were immense and took a
        mental toll on him.  Of this much I am sure.

19

20  (Letter from C.G.)  Maher's sister, Maya Pendleton, similarly describes Maher's

21  dedication to family:

22      Maher was a sensitive and caring young adult, very close to the family
        especially me and dad, and always honest, truthful and loyal to his friends.
23      He was trustworthy, trusting (sometimes to a fault) and always kind.

24  (Letter from Maya Pendleton.)

25      Maher's devotion to his family persisted and continues to this day.  As his friends

26  from business school who have known Maher for over seventeen years observe:

27      I have repeatedly witnessed the love and devotion Maher has for his
        family and the close bond that his family shares.  I saw Maher almost
28      daily for the two years we were in school together.  I recall him speaking

on the phone with his parents and siblings every day, often several times a day. . . .  The bond his family shares is very special, and the love and devotion Maher has for his family set him apart from our classmates and drew respect from those who knew him.

(Letter from M.C.)

Since I have known him, Maher has always had very strong family values. He is close to his mother and was crushed when his father died.  He was always very concerned about his brother and his brother's problems from when I first got to know him.  He would drop everything to tend to family situations.  It seemed to me that Maher was the healer in the family offering support and conciliation.

(Letter from C.K.)

As noted by his close friends, Maher's commitment to his family often led to attempts to mediate and handle demands placed on the family by Michael.  After graduating from U.C. Berkeley, for example, Maher delayed for approximately six months his move to New York to take a position at Coopers & Lybrand in the tax consulting group in order to help his family take care of Michael, who was then recovering from complications related to gastric bypass surgery.  (*See* Salman Tr. at 13:1–8, 13:15–20, 158:10–16; Bayyouk Tr. at 10:1–3, 11:2–8.)

Maher's decision to move to New York was in part to remove himself somewhat from "the stress that [his] brother had put on [their] family." (Salman Tr. at 13:21–14:7.) Michael, who is approximately ten years older than Maher, has struggled with addiction and mental health issues, including bipolar disorder and depression, throughout Maher's life.  (*See* Bayyouk Tr. at 97:25–98:2, 99:6–8, 100:15–17; Salman Tr. at 141:24–143:9, 144:10–145:1.)  Maher looked up to his older brother, but was "hurt[]" by Michael's sometimes erratic behavior, so moving to New York after graduating from college was an opportunity to "break free . . . and live [his] life independently without a lot of the stress that was coming along with it" in San Francisco.  (*See* Bayyouk Tr. at 99:3–18; Salman Tr. at 14:5–7.)

As an adult, Maher's relationship with Michael was marked by periods where Maher would try to help Michael but then recede in frustration.  (*See* Bayyouk Tr. at

99:19–25; *see also* Salman Tr. at 153:17–24.)  Maher's love for and desire to help his

brother, however, were always strong.  On one occasion, for example, after graduating

from business school, starting work at Citigroup, and moving back to the Bay Area,

Maher had to leave his office in the middle of the day to care for his brother after getting

a call from the doorman of his building telling him that Michael, who was intoxicated,

was asking to be let into Maher's apartment.  (*See* Bayyouk Tr. at 13:6–14:6; *see also*

Salman Tr. at 17:2–23, 146:18–147:4.)  After this incident, Maher began once again to

have more contact with Michael as Michael worked on his addiction issues in rehab and

sought psychological treatment and diagnoses.  (*See* Salman Tr. at 154:16–155:16.)

Maher's friends observed the complex dynamic and relationship Maher had with

Michael:

> I witnessed the stress Maher would be under when his brother's behavior
> was erratic and how he struggled to help support his brother and his
> brother's family.  When my own brother was hospitalized with bi-polar
> disorder in 2007, I understood firsthand the stress Maher felt in wanting to
> do anything that might help, and the fear and powerlessness in not having
> any control.  While any illness puts financial, emotional and physical
> stress on a family, mental illness brings additional anxiety in dealing with
> unpredictable behavior and the knowledge that the mentally ill person is
> often not capable of acting in his or her best interest.

(Letter from M.C., a friend from business school who has known Maher for over

seventeen years.)  Maher's mother similarly describes his relationship with Michael:

> Maher was there for our family in many more ways than financially.  He
> carried a huge burden in aiding his brother who struggled with many
> different challenges in his life.  Maher supported [Michael] and his family
> through many serious crises, never turning his back on his brother, sister
> in-law (Mariam) or their children (Jonathan and Janine).  To this day,
> Mariam considers Maher as more than a brother, and the children depend
> on him for advice sadly more than their own father.  Faced with many
> frequent and challenging circumstances surrounding our family, Maher
> has unfortunately always had to respond to tragedies initiated by others
> who may not have been in control of what they were doing.  I sometimes
> blame myself for asking too much of Maher—always needing his help to
> pick up the broken pieces left by others. . . .  While Maher lived in other
> cities including Chicago, New York and London, he would check in daily
> with all of us.  Whether he was running through an airport, on a flight or
> working late (which was every night) he never forgot to call and say "Is
> everything ok, do you need anything, I love you."

(Letter from Souad Kara.)

Maher's father was diagnosed with cancer in late 2003 and passed away in November 2004.  Michael was very close to their father and became "extremely depressed and was not himself and was actually suicidal" after their father passed away. (Bayyouk Tr. at 26:4–7; *see also* Salman Tr. at 42:10–43:1.)  Around the time of their father's forty-day memorial service, for example, Maher recalls Michael expressing his desire to "be with [their] dad" as he put a loaded gun in his mouth.  (*See* Bayyouk Tr. at 26:9–18; Salman Tr. at 43:15–25.)

Maher, who had transferred to Citigroup's New York office by that time, traveled regularly to the Bay Area during his father's illness and continued to do so after his passing to be with his family and support Michael as they all grieved the loss of their father.  Maher's sister and mother describe the effect that the illness and passing of Maher's father had on their family:

> Maher and I simply clung to each other and to our faith, as we watched in distress the extreme emotional and mental toll on our family, and we tried to keep a semblance of normality through our jobs and each other, because we knew that we had to.  But our guards and defenses were down.  We could not stay on top of what was happening all around us.  Physically, mentally and emotionally drained, our family was shaken with dad's passing in November 2004 . . . .  I remember Maher being so exhausted that I worried he too would buckle under the physical and emotional seesaw and strain.  Thankfully, we pulled through it but not without wounds.

(Letter of Maya Pendleton.)

> When Maher's father was diagnosed with a terminal brain tumor . . . our world forever changed.  Each of my children handled the grief differently . . . .  [Michael] was unable to cope with what was happening.  He loved his father incredibly but was unable to handle the stress of his father's illness and began to self-medicate in order to cope with the tragedy. Maher was living in New York, and was devastated by the news . . . . Maher worked tirelessly to find remedies for his father.  He called large companies to try and get them to make medications available for his dad. He succeeded with one medication which unfortunately did not work. Maher flew home almost every weekend from New York to be at his father's bedside.  Maher would bathe his father, help him in the restroom after he lost his ability to walk, get him his medications and sleep in bed with him every night to give me an opportunity to get some strength back and to make sure his dad would not fall out of bed.  As we were all devastated watching my husband lose his ability to walk, speak and eventually see, Maher never lost sight of hope.  He would travel late at night on Sunday to New York so that he could be back in his office

Monday morning and return at the end of the week.  Maher never failed to meet the demands of his very busy career while being the fine son we had raised.  He is an example of what I would wish every son would be.

(Letter of Souad Kara.)

### 3.     Maher's career, marriage, and children

After receiving his MBA in 1998, Maher began work as an investment banker at Salomon Smith Barney, which became part of Citigroup in 1999.  (*See* Bayyouk Tr. at 11:16–23.)  After working initially as a generalist associate for a year, Maher worked in the San Francisco technology group.  (*See* Salman Tr. at 15:9–16:1.)  He then joined the healthcare group in mid-2002, where his focus was on biotechnology and pharmaceutical companies.  (*See* Salman Tr. at 16:2–6.)  Maher was initially based in the Bay Area, but relocated to New York in 2003.  (*See* Salman Tr. at 16:7–14.)  Maher remained at Citigroup until 2007 when he left to move back to the Bay Area and begin work at Lehman Brothers.  (*See* Bayyouk Tr. at 11:24–12:3.)

Maher excelled in his job as a result of his strong work ethic, intelligence, and integrity.  He was well-regarded and endeared himself to his colleagues and clients, with whom he formed strong bonds.  Maher's former colleagues at Citigroup write:

I have always known Maher to be an honest, thoughtful, kind and considerate person; someone who holds himself to high standards both morally and ethically.  Maher goes out of his way to help and think of others first.  I remember when I worked with him that he would bring in flowers for the office assistants for no particular reason.  Everyone in the office liked him.  He is a people person, and clients liked him too.  Even though he often worked late hours, he was always willing to take the time to listen and offer counsel when people had problems.  I remember him helping out lots of people in the office.  To this day, I still reflect on his sage advice and thoughts when speaking about a difficult transition that our office was going through and how best to manage the situation.  He was a good, empathetic listener, and I felt that his thoughts and suggestions were anchored in sound ethics.

(Letter from C.K., a friend from business school and former colleague at Citigroup who has known Maher for over seventeen years.)

Maher developed an incredibly close and trusting relationship with his clients, which was unusual for someone that young.  The senior management and board of directors at his client firms trusted his advice and integrity and sought his counsel.  In his dealings with his clients he made it a point to be direct and honest in all his interactions and especially

1

in navigating difficult choices for the company.  He was one of the few
bankers I knew who was actually concerned about the impacts of his
advice on the daily lives of the ordinary employees at client firms and the
ramifications of his advice. . . .  I learned much working with him and
watching his level of dedication to his clients and the thoughtful and
compassionate way he handled difficult decisions.

In his interaction with junior bankers he was also equally thoughtful and
respectful of their time and effort.  In general, junior bankers work 80-100
hours a week, including most weekends, and are often simply expected to
do so by senior bankers.  Maher made it a point to meet with the junior
bankers to explain to them the work required well ahead of the due date
and went to much pain to efficiently coordinate the process to minimize
"busywork" by the juniors.  As a result of his conscientious efforts to
make their daily lives a little easier he was very popular among the junior
bankers and they actively sought out projects to work with him. . . .
Maher played an active role in recruiting junior bankers to the bank and
represented all the key traits we were looking for in new recruits.  His high
integrity, strong ethics, intellectual rigor and excellent communication
skills made him the face of our team to new recruits.

(Letter from R.S., a friend from business school and former colleague at Citigroup who

has known Maher for over seventeen years.)

[Maher] set the high watermark for work ethic and how we should
represent ourselves, the team and the Company.  He had earned the respect
and trust of the managing partners and was quickly promoted to the
Staffer, a position typically reserved for much more senior professionals.
In that role, he was responsible for helping investment bankers manage
their time and the stress and pressure of the position.  He was the sounding
board for difficult questions and ensured that everyone was being treated
equitably despite the challenges and volatility of the workload.  He had to
balance the demands of clients across the group and was the arbiter of
conflict within the office.  His success in that position was because
everyone in the organization trusted his character and the integrity with
which he made the hard decisions.

(Letter from J.M., a friend and former colleague at Citigroup who has known Maher for

over fifteen years.)

And though he was there for only a short period of time, Maher's colleagues at

Lehman Brothers echo the sentiments of his Citigroup colleagues:

Within a few days of Maher joining Lehman Brothers I could tell he was
different from the typical senior investment banker; unlike his
predecessors he demonstrated a genuine interest in actually getting to
know every individual on the team no matter how junior.  I would come to
learn that Maher cared deeply about the people around him and made sure
to work for us just as much as we worked for him.  Even during stressful
situations, he would always take the time to see how he could make our

SENTENCING MEMORANDUM                                                                                    12
Case No.  09-CR-00417-EMC

1
2
3
4

> experience better. . . .  Maher's empathy and thoughtfulness also extended
> to his clients.  I saw firsthand how hard he worked to help his clients
> achieve their goals.  One of the most valuable career lessons I learned
> from Maher is that, while not always easy, when faced with a tough
> decision, put your clients first and things will likely work out for the best.
> . . . I am sincerely grateful for the impact that Maher, a man I have
> learned much from and continue to admire, continues to make on my life.

5 (Letter from H.Y., a friend and former colleague at Lehman Brothers who has

6 known Maher for over seven years; *see also* Letter from S.P., a friend and former

7 colleague at Lehman Brothers who has known Maher for over seven years.)

8      While working at Citigroup, Maher was introduced to his wife, Susie, through

9 mutual friends of their families.  (Salman Tr. at 7:4–8.)  They were engaged in June 2003

10 and eventually married in July 2005.  (*See* Salman Tr. at 40:23–41:3.)  As Susie explains,

11 their attraction and love was present from the beginning of their relationship; she

12 describes their first communication and being "taken aback by Maher's humility and

13 goodness."  (Letter from Sawsan Kara.)  Susie writes:

14
15
16

> During the 3 years of our long-distance relationship, he never bragged
> about his personal, financial or professional achievements.  His connection
> to family, sense of humor, generosity, patience, and endearing nature are
> the same qualities that led me to marry him over nine years ago and
> continue to make me proud to call him mine to this day.

17 (*Id.*)  Prior to their marriage, Maher's and Susie's families also became very close

18 because "it's customary in the Middle Eastern culture that when [a couple] get[s]

19 married, it's not only a union of the two people [getting married], but it is also a union of

20 the[ir] families."  (Salman Tr. at 76:2–5.)

21      Maher and Susie have two children:  G., who is seven years old, and A., who is

22 six years old.  Maher has been their primary caregiver during the past six years and has

23 fully embraced his role as full-time dad.  Along with Susie, G. and A. are the center of

24 Maher's universe.  From taking care of the home, to making sure everyone gets to their

25 many activities, to volunteering in G.'s and A.'s school classrooms, Maher demonstrates

26 his devotion to his children and family on a daily basis.  Susie describes the "extreme

27 role reversal" that has occurred as Maher's routine has shifted from that of an investment

28 banker to "play dates, being a soccer dad, filling in for the tooth fairy when needed, and

therapeutic cooking for his friends and family." (Letter from Sawsan Kara.)  She

describes Maher's daily activities:

> A typical day starts off with Maher getting up at 4:30 a.m. to go to a local gym that has boot camp type workouts until 7 am (what I call his mental sanity).  He comes home exhausted but preps [G.] [and] [A.]'s lunches and makes sure I have a lunch packed as well as he knows my lunch hour is non-existent.  He drops our son and daughter off to their first and second grade classrooms at school at 8:00 am.  Most days Maher spends either paying bills, grocery shopping, tending to household needs, volunteering in the children's classrooms with different projects, or trying to keep up on world and business events.  He picks up the children at 3 pm and then is chauffeur for the afternoon to either swimming lessons, soccer lessons, hosting princess play dates . . . or helping the kids with their homework while prepping dinner.

(*Id.*)  Maher's mother and his friends similarly describe his complete dedication to and

love for Susie and their children:

> Maher has embraced the role of full time care taker for his family.  He not only assumed all responsibilities of the household, he has formed an unbreakable bond with his wife and children through his actions.  He has raised two incredible infants, and they are now beautiful toddlers in [first] and [second] grade.  The family depends on Maher to handle all the household and kids logistics, including school drop off and pick up, after school sports (almost daily), volunteering weekly in their classes and home care and cooking.

(Letter from Souad Kara.)

> For Maher and his wife Susie, the immediate impact of this event was acute.  Susie . . . was required to immediately start working as a pediatrician, and Maher to reverse his role as financial provider to that of care-giver for their two small children.  For Susie, this has been nothing short of a state of perpetual heartbreak, as she has been forced to give up that which she cares about most in the world:  the giving of constant care and nurturing for her two small children.  For Maher's part, he immediately accepted and excelled in his new role as daily care-giver for the kids, transitioned from highly-decorated investment banker to dad, with that same amazingly high "Maher" level of dedication and commitment that characterized him professionally.

(Letter from A.D., a friend who has known Maher for over ten years.)

> Since the acts giving rise to this case, Maher has found true love with his wonderful wife . . . who has stood by him every second of the way.  In addition, Maher has discovered the true meaning of life and unconditional love in his beautiful children . . . .  Maher is totally devoted to his wife and children.  Given his circumstances, his wife has had to work full-time, so he wholeheartedly embraced full-time care of his children.  As Maher worshipped his father, his children now worship him.  Ironically, through

this painstaking process, Maher has achieved his goal of becoming just like his father—a humble servant for his children.

(Letter from I.M., a friend from childhood who has known Maher for over thirty years.)

Since his loss of employment, Maher has also engaged in continuing education and volunteer work. Maher studied and attended classes one or two nights a week at the University of California, Santa Cruz Extension to obtain a certificate in biotechnology, which he completed in June 2012. During this time, Maher also spent over 300 hours volunteering at the Stanford University Cancer Center. As a volunteer "navigator," Maher worked directly with patients and their families to make sure patients' needs were addressed. He communicated with doctors and staff to ensure wait times were managed correctly, accompanied patients around the clinic and to their vehicles, tended to patients receiving chemotherapy by bringing them food, drinks, and reading materials, and just kept them company during their treatment.

Maher's brother-in-law Daniel Pendleton describes Maher's commitment to volunteer work and also the care Maher has provided for Daniel's brother-in-law, who is fighting cancer:

> Since his dad's passing, [Maher] has volunteered at the Stanford Hospital Cancer Ward, giving help to cancer patients and their families. His desire to care for others has been an especially great help to my wife and I while living overseas. Since we are ten thousand miles away from being able to give any hands on help to family members who need it, he has stepped up to provide help in our place. One such instance was in helping my sister Debra and her husband David. David is fighting cancer and was at Stanford after undergoing a transplant. They lived in Vacaville and his stay extended beyond what they had hoped for. Maher, hearing of their troubles, went to the hospital multiple times with food, medications and whatever else they needed, and spent time with them tending to their needs. I am very grateful that Maher stepped in unasked to help my sister during this very trying time. This is the kind of person Maher is, he genuinely cares for others.

(Letter from Daniel Pendleton.)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**B.      The Nature and Circumstances of Maher's Offense**

**1.      Maher's participation in the insider trading scheme**

Maher does not dispute his offense conduct as set forth in detail in the PSR and fully recognizes the seriousness of his offense.  While insider trading is wrong regardless of why an individual engages in it, unlike most insider traders who are motivated by greed or status, Maher's complex relationship with and history of wanting to help his brother Michael, as well as his sympathy for Michael's struggles, caused him through a series of self-deceptions and a misguided sense of family responsibility to stray from his strong sense of right and wrong and give Michael material nonpublic information as a way to support and help his mentally ill brother.

As Maher explained in his testimony in the *Bayyouk* and *Salman* trials—and as noted by the PSR—his sharing of material nonpublic information with Michael evolved over time.  (*See* Bayyouk Tr. at 22:20–23:6; Salman Tr. at 32:11–21.)  When Maher started working in the healthcare group at Citigroup, he began to ask Michael, who had a science background, questions about biotechnology and the science associated with certain pharmaceuticals produced by Maher's clients to gain a better understanding of the industry.  (*See* Bayyouk Tr. at 22:20–23:11; Salman Tr. at 32:22–33:4.)  At that time, Maher "gave [Michael] clear instructions that [the] information [he] was sharing with [Michael] was confidential" and believed that Michael was maintaining that confidentiality.  (Salman Tr. at 33:13–16.)  Later, when their father was diagnosed with two different types of cancer, Maher shared confidential information with Michael as they discussed treatment and pharmaceutical options for their father.  (*See* Bayyouk Tr. at 23:20–24.)  During the course of those discussions, they discussed confidential information regarding companies, including Maher's Citigroup clients, that provided treatments that might help their father.  (*See* Bayyouk Tr. at 23:13–24; Salman Tr. at 34:4–9; *see also id.* at 37:7–38:11.)

Maher and Michael grew closer during this time, and Maher thought that Michael had become a "friend[]" and someone that he could "lean[] on" and "vent to . . . about

1    [his] career and about issues going on in [his] group." (*See* Bayyouk Tr. at 59:2–4.)

2    Maher would thus sometimes discuss his work with Michael, share good news, or vent

3    his frustrations, assuming that Michael would not act on any confidential information that

4    Maher conveyed to him.  (*See, e.g.*, Bayyouk Tr. at 33:25–34:7, 34:19–21, 43:12–14,

5    57:19–59:10; *see also* Salman Tr. at 51:16–19, 58:22–59:4, 68:3–18.)  Maher testified

6    that he "got so comfortable—naively comfortable and completely unguarded about [his]

7    relationship with [Michael] that it felt like there[] [was] no possible way [Michael] would

8    do something." (Salman Tr. at 87:15–17.)  Talking to Michael in effect was "like talking

9    to a . . . sound[ing] board." (Salman Tr. at 87:19.)

10       Over time, however, and after their father's death, Maher noted that Michael's

11   conversations became "much more targeted" and his questions focused on the "business

12   end" of companies.  (*See* Bayyouk Tr. at 72:2–9; Salman Tr. at 34:11–15.)  This caused

13   Maher to ask Michael "point blank" whether he was trading.  (*See* Salman Tr. at 34:16–

14   17.)  Michael denied trading and reassured Maher by swearing on Michael's daughter's

15   life.  (*See* Bayyouk Tr. at 25:8–13; Salman Tr. at 34:17–18.)  In addition to becoming

16   "more targeted," Michael became "very persistent" and "nagging" in asking Maher

17   questions, which created tension between them because Maher no longer wanted to

18   answer Michael's questions or discuss his work with Michael.  (*See* Bayyouk Tr. at 72:2–

19   9, 74:20–21.)  When Maher's suspicions continued despite Michael's assurances, Maher

20   actively tried to avoid speaking to Michael.  (*See* Salman Tr. at 34:21–24.)

21       As Maher testified, however, there were two instances where he provided

22   material nonpublic information to his brother (at Michael's instigation) with the

23   expectation and intention that Michael would trade on the information.  That testimony is

24   summarized below.

25                **a.        United Surgical Partners International**

26       In the summer of 2006, Maher was at his brother's house watching a television

27   show about leveraged buyouts.  (*See* Bayyouk Tr. at 71:2–9.)  Michael asked Maher what

28   sort of entities conducted leveraged buyouts.  (*See* Salman Tr. at 91:13–16.)  At the time,

1   one of Maher's colleagues at Citigroup was handling a possible leveraged buyout of

2   United Surgical Partners International ("USPI") by a private equity firm that was USPI's

3   largest shareholder.  (*See* Bayyouk Tr. at 70:5–14.)  Maher used USPI as an example to

4   explain a leveraged buyout scenario to Michael.  (*See* Bayyouk Tr. at 71:10–12; Salman

5   Tr. at 91:17–24.)

6         A couple of months later, when Maher was back in the Bay Area, Michael

7   brought up the topic of USPI again and told Maher that "he was doing some work and

8   that [USPI] looked reasonably cheap to him."  (Bayyouk Tr. at 71:13–20; *see also*

9   Salman Tr. at 91:25–92:4.)  Michael's comment about USPI looking "cheap" and his

10  persistent questions about USPI confirmed Maher's suspicion that Michael was actually

11  trading and specifically looking at USPI as an investment.  (*See* Bayyouk Tr. at 72:9–12;

12  *see also* Salman Tr. at 92:5–8.)

13        Michael continued to ask Maher about USPI, and Maher eventually capitulated to

14  Michael's persistent questions about USPI, expecting that Michael would trade on the

15  information.  To "get [Michael] off [his] back," Maher made what he acknowledges was

16  the "wrong decision to encourage [Michael]" by giving him a publicly available research

17  report that noted USPI as a potential leveraged buyout candidate and disclosing the

18  material nonpublic information that his Citigroup colleague was actually then working on

19  a transaction involving the leveraged buyout of USPI.  (Bayyouk Tr. at 72:9–20, 76:9–

20  12; *see also* Salman Tr. at 34:25–35:5, 94:14–21.)

21        Maher continued to appease Michael's relentless requests for updates on USPI

22  and would tell Michael that his colleague "was still busy" to reassure Michael that the

23  transaction was still pending.  (Salman Tr. at 93:21–94:3; *see also* Bayyouk Tr. at 75:16–

24  25.)  Maher explained that "[t]he goal at that time was to give [himself] relief from

25  [Michael], and [he] felt that was the way to do it, was to give [information about USPI]

26  to [Michael]."  (Salman Tr. at 95:1–2.)  Michael never disclosed to Maher that he was

27  trading, but Maher "fully expected that he was trading."  (Salman Tr. at 36:14–20.)

28

### b.     Biosite

In March 2007, Maher again shared material nonpublic information with Michael with the expectation and intention that Michael would engage in trading.  While in a taxi on his way to meet a colleague, Maher received an email from an assistant at Citigroup telling him to call his brother.  (*See* Bayyouk Tr. at 79:16–20.)  When Maher called, Michael said that he had not been feeling well and conveyed with a sense of urgency that he needed a favor—and specifically "some information."  (*See* Bayyouk Tr. at 79:19–80:4; Salman Tr. at 106:10–21; *see also* Bayyouk Tr. at 103:14–104:8; Salman Tr. at 176:14–24.)  Michael "sounded very troubled and a little bit distant on the phone." (Bayyouk Tr. at 79:20–21.)  Michael clarified that he did not need money, but that he "owe[d] somebody" and repeated, "Please, I need this.  Please, I need this."  (Bayyouk Tr. at 81:1–4; Salman Tr. at 106:17–21.)  Maher realized that Michael was asking for confidential information.  (*See* Bayyouk Tr. at 80:6–7.)

Given Michael's history and the way he sounded, Michael's plea for information "set [Maher] off."  (*See* Bayyouk Tr. at 103:14–23; Salman Tr. at 176:9–11.)  Maher "was panicking and wondering what [Michael] had gotten himself into."  (Salman Tr. at 106:25–107:1.)  In that moment, Maher told Michael that a company called Biosite would likely be acquired as early as the next week.  (*See* Bayyouk Tr. at 103:14–23, 80:5–13; Salman Tr. at 107:2–4.)  Maher had learned this information from colleagues during an officer luncheon at Citigroup earlier that week.  (*See* Bayyouk Tr. at 77:7–11; Salman Tr. at 103:23–104:7.)  Like USPI, Biosite was not a transaction that Maher was working on personally.  (*See* Bayyouk Tr. at 77:4–6.)

Maher acknowledges that the decision to provide Michael material nonpublic information about Biosite was "[t]errible judgment, and it was an issue of panic." (Salman Tr. at 110:12.)  He testified, "I didn't know what my brother was involved in. When I offered him money[,] he said it wasn't about money and he didn't need money.  I didn't know what he had done.  And, he said he needed information.  And, that's what I gave him."  (Salman Tr. at 110:12–16.)

1    Maher immediately regretted providing this information to Michael.  (*See*

2    Bayyouk Tr. at 81:2–9.)  He called his brother back after getting out of the taxi and told

3    Michael that "what [he] just did was terribl[y] wrong [and] illegal" and that if Michael or

4    anyone else were to "act on [it], [they would] get into a lot of trouble."  (*See* Bayyouk Tr.

5    at 81:2–9; Salman Tr. at 107:20–108:4.)  Maher asked Michael not to use that

6    information and not to convey it to anyone else.  (*See* Bayyouk Tr. at 81:2–9.)  Michael

7    told Maher not to worry, but Maher believed Michael was going to trade on the

8    information anyway.  (*See* Bayyouk Tr. at 81:10–13; Salman Tr. at 108:5–9.)

9                                              ***

10   Maher never traded on material nonpublic information himself, did not financially

11   benefit from Michael's trading or seek to financially benefit from Michael's trading, was

12   not aware of the amount of profits associated with Michael's trading (indeed, they never

13   discussed Michael's trading), and was not aware of any downstream tippees with whom

14   Michael shared material nonpublic information.  Nonetheless, Maher does not minimize

15   the seriousness of his conduct and makes no excuses for his offense and its

16   consequences:

17         I fully understand the gravity of the crimes I have committed and the
           importance of the laws which I broke.  I don't think "remorseful" can
18         characterize appropriately the regret and shame I feel about what I have
           done.  I have caused unnecessary pain and embarrassment, especially to
19         the people that I love most—the very people I had wanted to make proud
           of me.  I have failed as a son, as a husband and as a father to fulfill the
20         expectations I had for myself from childhood.  I single-handedly shattered
           my dreams of taking care of my parents, wife and children.  I have
21         apologized to all of them for several years, yet I still struggle daily with
           how to look them in the eye and seek their forgiveness.  I have destroyed
22         my reputation and a lifetime of hard work and effort that allowed me to
           gain privileged degrees and employment opportunities.  I have put my
23         wife in the difficult position of being the sole financial provider for our
           family.

24

25   (Letter of Maher Kara.)  Indeed, fully acknowledging the seriousness of his offense,

26   Maher has made extensive efforts to remedy and atone for his misconduct.

27                          **2.**      **Maher's extraordinary cooperation**

28   Perhaps the greatest demonstration of Maher's profound remorse and

1   rehabilitation is his extraordinary cooperation with the government's investigation of the

2   insider trading scheme despite the consequences for his family relations.  *See United*

3   *States v. Zolp*, 479 F.3d 715, 721–22 (9th Cir. 2007) (sentencing evaluation under

4   § 3553(a) includes the history of a defendant's cooperation and characteristics evidenced

5   by cooperation).  Based on that extraordinary cooperation, the government has made a

6   § 5K1.1 motion for a Sentencing Guidelines downward departure.

7            Maher fully acknowledges that when he was first contacted without notice by the

8   SEC staff by telephone on May 1, 2007, he did not provide truthful responses to some of

9   the staff's questions.[2]  On April 21, 2009, a grand jury in this district indicted him on one

10  count of conspiracy to commit securities fraud and thirty-four counts of securities fraud.

11  (*See* ECF No. 1.)  Maher initially entered a plea of not guilty, given the breadth of the

12  indictment and the initial "den[ial]" with which he struggled.  (*See* Salman Tr. at 117:22.)

13  However, by early 2010, Maher was prepared to plead guilty and sought to cooperate

14  with the government's investigation of the insider trading scheme.  In his own words:

15           As months after the indictment went by, I continued to struggle with
16           denial, but eventually realized that my family and my integrity meant
             more to me than anything else.  At some point in my life I was going to
17           have to answer to myself, my wife and my children—and in order for me
             to restore my own integrity, I found no other solution than telling the truth
18           and admitting that I had made a serious mistake.  I knew that the only way
             I could live with myself and be able to eventually tell my two children
19           what I had done was by telling the truth, first and foremost, to myself.  I
             told my wife that I had been lying to her, begged her not to leave me and
20           hoped she knew that I really was the same man she intended to marry.  I
             voluntarily met with the Department of Justice and SEC, told the truth
21           about my actions and offered to cooperate with their investigation, hoping
             that I could begin my path to redemption.

22  (Letter from Maher Kara.)

23           Maher's attorneys first proffered to the government on March 4, 2010.  Maher

24  subsequently proffered to the government for the first time on April 21, 2010.  Further

25  _____

26  [2] Maher explained in his trial testimony that he made false statements because "[he] was
    terrified, scared" and at the time Susie was nine months pregnant and he was "afraid that
27  [his] career would end," "afraid of going to jail," and "scared of the consequences on his
    family."  (*See* Bayyouk Tr. at 88:24–89:7; Salman Tr. at 116:11–20.)

28

proffers were delayed for almost a year while attention was focused on resolving issues related to Michael's competency to plead guilty.  Maher provided further proffers on April 6, 2011, and April 29, 2011.  After the proffers were finally completed, Maher entered a guilty plea on July 6, 2011, to one count of conspiracy to commit securities fraud and one count of securities fraud, pursuant to a cooperation agreement.  (*See* ECF No. 134.)

Maher continued to meet with the government to provide assistance whenever requested.  Susie also met with the government at the government's request in August 2011.  Maher testified before a grand jury on August 18, 2011.  The government subsequently filed criminal charges against Mr. Salman on September 1, 2011, and against Mr. Bayyouk on May 29, 2012.

Approximately a year later, beginning in May 2013, Maher began to meet with the government to prepare to testify at the *Bayyouk* and *Salman* trials.  As he prepared to testify during several meetings leading up to the trials, Maher volunteered additional information, which resulted in another proffer on May 31, 2013, and identified documents that he thought might be relevant to the government's continuing investigation and trial preparation.  Susie also met with the government at its request.  This was particularly difficult for her given that Mr. Salman is her older brother and Mr. Bayyouk is Mr. Salman's wife's brother-in-law.

Maher testified as a key government witness at both trials.  Susie was called by the government and testified at the *Bayyouk* trial.  She also provided information to the government relevant to her prospective testimony at the *Salman* trial, in which she testified in response to a defense subpoena.  Maher's efforts directly contributed to securing the convictions of both Mr. Bayyouk and Mr. Salman.

If this Court measures Maher's cooperation by the quality of information and testimony provided, he has proven himself exceptionally worthy of leniency.  His cooperation and testimony also demonstrate his sincere remorse for his offenses.  Maher has been fully forthcoming in his cooperation and fully responsive to the government's

1   requests, providing complete information regarding his communications with Michael

2   and all matters within his knowledge relevant to the insider trading scheme.  As

3   explained in further detail below, Maher's cooperation with the government has entailed

4   years of uncertainty, further delayed his ability to commit to full-time employment and

5   begin a new career, and caused great strain on his relationship with his family and the

6   destruction of his and Susie's relationship with Susie's family.

### C.   Under the Circumstances of This Case, a Probationary Sentence Without Home Confinement Will:

#### 1.   Reflect the seriousness of the offense, promote respect for the law, and provide just punishment.

10        Maher fully comprehends that insider trading is a serious offense.  By cooperating

11   with the government and its investigation, he has worked to correct and atone as much as

12   possible for his wrongful conduct.  Given Maher's extraordinary cooperation and the

13   consequences of that cooperation for Maher and his family, a probationary sentence

14   without home confinement would still reflect the seriousness of his offense and promote

15   respect for the law.  It would also provide appropriate inducement for potential future

16   cooperators who are often essential to discovering and prosecuting insider trading cases.

17   Under the circumstances of this case, a probationary sentence would also provide just

18   punishment.  Indeed, Maher has already paid, and will continue to pay, a substantial price

19   for his offense.

20        In addition to the direct monetary cost of any civil penalty he will pay as part of

21   his settlement with the SEC,[3] Maher is the only defendant whose career was destroyed as

22   a result of this case.  His career as an investment banker ended in October 2008, and he

23   has now spent more than six years without alternative professional opportunities or any

24   means to support himself and his family.  During that period of time, Maher has had to

---

[3] Maher has actively sought to resolve the SEC charges against him for the past five years, including through payment of an appropriate civil penalty.  The SEC has taken the position, however, that it cannot resolve the case against Maher without a comprehensive resolution that includes other defendants.  Maher is hopeful that resolution will be possible now that the criminal prosecutions are completed.

28

borrow money from his sister and a friend to cover bail and legal costs, and from his

mother to cover monthly expenses.  Susie has become the sole earner for their family.

Maher's personal net worth has been reduced to a negative amount, and with the SEC

enforcement action still pending, his financial prospects are unlikely to improve.  Maher

writes that since he lost his job at Lehman Brothers:

> I have struggled with my identity and tried to redefine myself.  I didn't
> realize how much I identified my existence with my previous career and
> quickly learned how much I had neglected everything else.  Our financial
> situation was bleak, and with my wife having to step in to the financial
> provider role, I had to assume responsibility of caring for my household
> and children.  I struggled greatly, as I felt unworthy as a husband and as a
> father.  After a great deal of self-reflection, I submitted to myself and
> accepted that my life was changed.  My professional career in investment
> banking was over.

(Letter from Maher Kara.)

In the more than five years since the indictment was filed and during the time he

has been cooperating with the government, Maher has remained in extended limbo—first

awaiting resolution of issues related to Michael's competency to plead guilty, then

completion of the *Bayyouk* and *Salman* prosecutions, and finally resolution of issues

related to Michael's sentencing, so that Maher's sentencing could go forward and he

would have finality that would allow him to commit to full-time employment and

building a new career.  During that time—unlike the other defendants in this case,

including Michael—Maher lost not only his career and job prospects, but an entire world

of professional and social relations.  His conviction has left him alienated from many of

his old friends and colleagues.  Remaining friends and former colleagues recognize the

effect that this prosecution has had on Maher:

> [T]he effect of these events to Maher from a work and professional
> perspective have been tremendous. . . .  Even as Maher has accepted at a
> very personal level his wrong-doing, there are several things which will
> forever change.  The simplest truth is that Maher will never be able to
> return to the profession he spent his life efforts preparing for and excelling
> in.  The culmination of all his schooling, all his late nights at work, all his
> tireless reading, will ultimately go unrewarded and ultimately unused. . . .
> He has seen his professional career decimated and his ability to secure
> meaningful employment placed on a seemingly never-ending "hold" as the
> proceedings indirectly related to his case were seemingly delayed with
> never-ending frequency.  He has watched helplessly as his wife Susie

continues to sacrifice that which she cares about most, being the daily care giver for their two small children [G.] and [A.]. In a very emotional and professional sense, Maher has been in "jail" for the past four years, unable to even attempt to restart a professional career (albeit in a completely new field), until his case is resolved in its entirety.

(Letter from A.D., a friend who has known Maher for over ten years.)

Overnight, [Maher] lost all his professional accolades which he spent most of his life building. He has lost significant past and future earnings from his career in investment banking. Because of the alleged conspiracy relating to his brother [Michael] and to his brother-in-law, he has been caught in the middle of this web of confusion, angst and fear for almost 7 years. The damages to his family, his relationships and to his soul is likely beyond repair and will persist for many years to come.

(Letter from I.M., a friend from childhood who has known Maher for over thirty years.)

[Maher] has been punished through loss of career and identity, reputation, status, and loss of money in addition to destroyed family ties . . . punishments that are as they should be given his admitted guilt.

(Letter from D.W., a friend from business school who has known Maher for over seventeen years.)

It is worth noting that while going through this situation over the last 6+ years, Maher has had a professional stigma hang over him. This cost him his former job, opportunities to work in financial services industry, and business reputation. Professionally and financially, Maher's sentence started years ago and he has already paid dearly. Even after this is resolved, he will continue to live with the stigma and pay a further cost in terms of the professional opportunities that will no longer be available to him.

(Letter from G.K., a friend from business school who has known Maher for over seventeen years.)

Maher ha[d] worked incredibly hard to achieve his professional and personal position before the charges were filed against him. All of that work was demolished due to the events of the last few years. He is deeply remorseful for his lapses in judgment that resulted in this outcome. I believe he is ready to put this part of his life behind him and rebuild his life for the sake of normality for his children. He understands that professionally he will never be able to reach the ambitions he had in the past but that is less important to him today than keeping his family together and moving to the next phase of their life.

1    (Letter from R.S., a friend from business school and former colleague at Citigroup who

2    has known Maher for over seventeen years.)

3        In addition to the devastating impact the case has had on Maher's career,

4    professional reputation, and financial situation, his relationships with Susie's family have

5    been virtually destroyed.  Coming from a Middle Eastern culture where family

6    relationships are of paramount importance, Maher deeply regrets that his offense has

7    caused a rift that affects not only him and Susie, but also their children, who will likely

8    grow up not knowing their cousins and extended family.  Indeed, Maher began his

9    cooperation not knowing that it would further tear apart his family and Susie's family.  In

10   his own words:

11       I originally thought my cooperation would be limited to telling the truth
         about my relationship with my brother and that I would be sentenced by
12       the second half of 2010.  I never imagined that it would last another 4
         years or expand in the direction that it did.  I deeply regret the broad
13       impact my actions triggered and still shudder over the pain it has caused to
         so many lives.  I wish I could take this pain away from the people I love
14       and place it all squarely on my shoulders.  When I realized my brother-in-
         law was involved and that I would have to testify against him, I wondered
15       whether my marriage would last.  While I had no idea about his or any
         other person's involvement other than my brother, I believed that my
16       mistake had been the cause.

17   (Letter from Maher Kara.)

18       Maher has not spoken to his brother, Michael, in more than six years.  And since

19   Maher testified as a government witness at Mr. Salman's trial, Susie's family has blamed

20   both him and Susie for Mr. Salman's conviction.  Susie's siblings no longer speak to her.

21   Mr. Salman has also encouraged the rest of Susie's family and extended family not to

22   speak to Maher and Susie, which has resulted in some family members being actively

23   hostile toward them and further deterioration of remaining family ties.  In her letter,

24   Susie summarizes the impact this case has had on their relationships with their families:

25       [W]ith all the combined losses of professional and personal reputations,
         employment and financial status, there is no greater loss that has been
26       incurred than that of the severance of our familial ties.  Maher hasn't
         spoken to his brother [Michael] in over six years.  Over 20 family
27       members including my three siblings and their families and children on
         my side have completely amputated themselves from Maher, myself and
28       our children after the convictions of my brother and his brother in law.

> While Maher and I supported Bassam and his family up to the day of his trial, they now flatly blame us for his conviction. Bassam told the entire family that Maher and I testified against him solely to benefit ourselves and that our testimony caused his conviction. After [Bassam] was convicted he called to yell at me, saying that I was no longer a "Salman," that I should never contact anyone in the family ever again and that I am "not welcome" at his funeral. Neither of my other siblings have given me an opportunity to speak to them or sought to understand the truth of the matter. . . .

> We have reached a point of disassociation with our families that is so unnatural to us and it has shattered our world. We feel exiled from a large and important part of our social and emotional foundation. Maher and I experience daily struggles and still are in a state of disbelief of how an unplanned act of recklessness could cause such a ripple effect of harm and pain to those he wasn't even aware were involved.

(Letter from Sawsan Kara.) Maher echoes his wife's sentiments:

> Most importantly, my actions have devastated our Middle Eastern family ties—ties that shaped the very essence of our lives from childhood. I haven't spoken to my brother in almost [six] years, and my wife's family—including her nieces and nephews whom she helped raise— haven't spoken to her since the conviction of her brother Bassam Salman. I fear that this break is going to cause a generational gap in our family relationship and that my children may grow up isolated from their extended family, not knowing their cousins, uncles or aunts. This pain is by far the most piercing because our family ties and heritage defined Susie and me. As I reflect on the totality of this seven-year nightmare . . . I respectfully and sincerely say to you that I deserve all of it and blame no one but myself for what has happened.

(Letter from Maher Kara.) And Maher's mother writes:

> I cannot describe to you the pain and suffering that has been inflicted on our family as a result of this tragedy. Maher and [Michael] have not spoken to each other in almost [six] years. May[a] has vowed never to speak to [Michael] again. [Susie]'s brother Bassam has blamed [Susie] and Maher for his own actions and self-inflicted demise. As a result, none of [Susie]'s siblings, nor her nieces and nephews whom she has helped raise and is the Godmother for, have spoken to her since Bassam's conviction. Your Honor, we are from a culture that is rooted in family and to have this happen is a catastrophe beyond words.

(Letter from Souad Kara.)

Maher understands that his own actions put him in this situation, and he takes responsibility for that. He expressed during Mr. Salman's trial his genuine remorse for his conduct and acknowledged his responsibility for its consequences:

> My family has suffered a lot. I have—it's been my fault. I've caused this pain. And I've hurt my wife, I've hurt my wife's family, I've hurt my own family, I've hurt my kids. I've hurt myself. And, I want to put this matter to bed.

(Salman Tr. at 217:18–218:1.)

Even if Maher receives a probationary sentence, he will in no way have gotten off easy. Maher has already paid dearly for his offense, and will continue to pay. As he explained in his trial testimony, "I feel like I've been sentenced." (Bayyouk Tr. at 90:21.) "[T]his has been a nightmare that I have re-lived every day of my life for the last six years [since the SEC began its investigation]. I wish I could take it all back."

(Salman Tr. at 110:6–8.)

Susie describes Maher's deep and consuming remorse for his offense and the toll that this case has taken on him:

> Although Maher has had his physical freedom, he has been in a state of mental and emotional confinement and anguish since 2007. He has done everything I could imagine from someone in this position to cure himself and prevent the spread to others. He has testified for the government under the most awkward and painful of situations against my brother, Bassam Salman, and Mr. Karim Bayyouk. It has pained us both to see and know that pictures and video from our wedding—one of the most special days of our lives—was used as a government exhibit. I have not been able to watch it since as it painfully reminds me of the happiness in our families that once existed and how it seems to have disintegrated.

(Letter from Sawsan Kara.) Maher's mother writes:

> All of a sudden Maher was unemployed and had lost everything, including his reputation, career, financial strength and his morale. I watched my son fall to his knees and admit to me and his wife that he had made a terrible mistake. He told me that the only way he could ever regain his integrity was by telling the truth and taking responsibility for his actions. He blamed no one but himself.

(Letter from Souad Kara.)

Maher's close friend similarly attests:

> Over the past four years, I have spent many early morning[s] and late nights speaking with Maher on the phone (as I live in New York and he in San Francisco). Typically three to four times a week, for anywhere between 45-60 minutes per call, I have witnessed firsthand the degree of underlying strength, compassion, humility, and honesty that Maher

1
2
3

> possesses, and which has carried with him through this incredibly difficult
> ordeal. I can tell you without any hesitation or exception that Maher is
> truly and deeply remorseful for his actions. He has intensely personalized
> and acknowledged his behaviors, accepted them without condition, and
> realized that as a result his life can and will never be the same.

4   (Letter from A.D., a friend who has known Maher for over ten years.)

5   And Rev. Mario Prietto, the rector at the University of San Francisco and

6   former principal at St. Ignatius, who has known Maher since he was in high

7   school, writes about Maher's visit to see him after Maher was terminated from

8   Lehman Brothers:

9
10
11
12

> I had not seen [Maher] since he graduated from high school, and he
> wanted to seek spiritual counsel from me. We've met several times since
> then and in every instance I have been profoundly moved by his honesty
> and integrity, and his willingness to tell the truth and face up to the
> consequences of his dilemma. He is extremely remorseful and, as I
> understand his case, very much the victim of trying to help a seriously
> psychotic older brother.

13  (Letter from Rev. Mario Prietto.)

14  In short, Maher has already been punished to a significant degree for his offenses.

15  *See United States v. Stall*, 581 F.3d 276, 280 (6th Cir. 2009) (district court properly

16  considered defendant's background and collateral consequences of prosecution); *see also*

17  *United States v. Mora-Gomez*, 875 F. Supp. 1208, 1211 n.6 (E.D. Va. 1995) ("Included

18  in this category of consequences are such matters as damage to reputation, loss of

19  professional licenses, and loss of certain civil rights."). Taking into account Maher's full

20  acceptance of responsibility and the destruction of his career and family relations, a

21  sentence of imprisonment is not necessary to provide further punishment for his offense.

22  If given a probationary sentence, even without home confinement, Maher will be

23  "subject to several standard conditions that substantially restrict [his] liberty." *Gall*,

24  552 U.S. at 48; *see also id.* at 44 ("probation, rather than an act of leniency, is a

25  substantial restriction of freedom") (internal quotations and citation omitted). These

26  restrictions may include being required to report regularly to a probation officer, being

27  subject to unannounced home visits, the inability to associate with persons convicted of a

28  felony, and restrictions on his ability to vote and travel. Maher will also forever be a

SENTENCING MEMORANDUM
Case No. 09-CR-00417-EMC

29

convicted felon, stripped of many of his rights and subject to the social opprobrium that accompanies that status.

### 2.    Afford adequate deterrence to criminal conduct.

A prison sentence is not necessary to achieve general or specific deterrence in this case.  The destruction of Maher's career in investment banking, his continuing lack of professional opportunities, his current financial situation, and the devastation of his family relationships send a message of deterrence that is more than sufficient.  And if these losses were not enough, their effect has been heightened by their having taken place publicly and under media scrutiny that will follow Maher and his family for the rest of their lives.  A custodial sentence under these circumstances is not needed to further reinforce the consequences of violating the law.

The aims of specific deterrence also do not require a custodial sentence or home confinement.  Maher's lack of a prior record and his years of cooperation demonstrate that he understands the wrongful nature of his conduct and will not repeat his crimes. *See United States v. Gupta*, 904 F. Supp. 2d 349, 355 (S.D.N.Y. 2012) (granting variance based in part on aberrant nature of insider trading offense and fact that the defendant was "unlikely to repeat his transgressions"), *aff'd*, 747 F.3d 111 (2d Cir. 2014); *see also United States v. Adelson*, 441 F. Supp. 2d 506, 514 (S.D.N.Y. 2006) (noting ruined reputation of defendant following conviction as deterrent), *aff'd*, 301 F. App'x (2d Cir. 2008).  Indeed, his closest friends and former colleagues who know him best were shocked to learn of his conduct and overwhelmingly confirm that Maher's offense was an aberration and a marked deviation from a lifetime of integrity:

> Maher's serious outlook about serious things, his high level of respect for the institutions—including law and finance—that have contributed over the long span of centuries to the country's greatness . . . his high level of intelligence and knowledge of consequences, his years-long application as well as his disdain for taking the easy route, would altogether have kept me from believing he could ever be that type of person [to engage in insider trading].  Nor will I ever believe it is his true character.  Your honor, I have always known Maher's character to be one of honesty, hard work and goodwill towards others.  I have known him to be a person of the utmost generosity to friends and strangers alike.  Nothing at all in my

> entire personal experience with him over almost twenty-five years has led me to believe his is anything but a person of the highest integrity.

(Letter from C.G., a friend from college who has known Maher for over twenty-five years.)

> I feel that over-all, Maher's character has many outstanding traits. First, he has accepted full responsibility for his mistake. Again, I believe that this mistake was an isolated event and an anomaly in his character. I believe that since losing his career and professional contacts he has had a tremendous amount of time to reflect on his mistake. Maher has tried to correct it as demonstrated by his acceptance of responsibility and full cooperation with the ongoing investigations.

(Letter from A.R., a friend from grammar school who has known Maher for over thirty-one years.)

> Maher is a kind and generous individual and has paid a high price over the last few years due to his unfortunate lapses in judgment. He is deeply saddened by the impact this has had on his family, close friends and his future.

(Letter from R.S., a friend from business school and former colleague at Citigroup who has known Maher for over seventeen years.)

> Susie similarly attests:

> At the end of the day he is the one who has stood up under the most difficult of circumstances to say he and only he hurt himself and is forever sorry for such a failure in judgment that led to the crime that it did and the hurt to everyone involved. I know Maher, so I know that what occurred was an aberrant behavior and is an isolated event and Maher will . . . take every possible opportunity to redeem himself.

(Letter from Sawsan Kara.)

Despite the enormous emotional strain he and his family have suffered, however, Maher has not fallen apart, given up on his family, or felt sorry for himself. Rather, as discussed above, he has fully dedicated himself during this time to his children and his wife and worked to better himself and contribute to his community as he awaits final resolution of this case.

### 3.     Protect the public from future crimes.

Prior to this case, Maher had no issues of any kind with law enforcement. He has

1  demonstrated full acceptance of responsibility and remorse for his offense.  There is no

2  basis to conclude that imprisonment or home confinement is necessary to protect the

3  public.

**4.  Provide Maher with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.**

6  There is no need to provide Maher with any training, medical care, or other

7  correctional treatment.

**D.  The Kinds of Sentences Available**

9  The statutory maximum sentence the Court can impose for a violation of

10  18 U.S.C. § 371, a Class D felony, is five years' imprisonment; a three-year period of

11  supervised release; a fine of $250,000; and a mandatory special assessment of $100.

12  The statutory maximum sentence the Court can impose for a violation of

13  15 U.S.C. § 78j(b), a Class C felony, is twenty years' imprisonment; a three-year period

14  of supervised release; a fine of $5,000,000; and a mandatory special assessment of $100.

15  As reflected in the PSR, the Court may impose from one to five years of

16  probation in lieu of imprisonment.  (PSR ¶¶ 78-79.)  *See also* 18 U.S.C. § 3561(c)(1).

**E.  The Advisory Guideline Range**

**1.  The Sentencing Guidelines calculation**

19  Post-*Booker*, the advisory guideline range is only one of several factors that

20  district courts consider in their sentencing analysis.  *See United States v. Carty*, 520 F.3d

21  984, 991 (9th Cir. 2008) (en banc).  That range should not be accorded any greater

22  weight than the other factors.  *See United States v. Zavala*, 443 F.3d 1165, 1171 (9th Cir.

23  2006), *vacated on other grounds by United States v. Carty*, 462 F.3d 1066 (9th Cir.

24  2006); *see also United States v. Ameline*, 400 F.3d 646, 655–56 (9th Cir. 2005).  Rather,

25  with "a mind open to all of the nuances and possibilities of the human condition," the

26  Court must "find the most reasonable sentence for that person within the territory of all

27  possible reasonable sentences."  *Zavala*, 443 F.3d at 1170.

28

Maher agrees with the probation department's calculation of the Sentencing Guidelines prior to downward departures, with one exception; he:

- Agrees that the **base offense level is 8**, pursuant to U.S.S.G. § 2B1.4(a);

- Agrees that the offense level is **increased by 18 levels** pursuant to U.S.S.G. § 2B1.1(b)(1)(J), because the total gain was greater than $2,500,000 but less than $7,000,000;

- **Respectfully disagrees** that the offense level is **increased by 2 levels** pursuant to U.S.S.G. § 3C1.1 for obstruction (the "Obstruction Adjustment") for the reasons set forth below; and

- Agrees that the offense level is **decreased by 3 levels** pursuant to U.S.S.G. § 3E1.1 because he demonstrated acceptance of responsibility for his actions and assisted the government in its investigation.

Accordingly, the proper offense level is **23** prior to consideration of any downward departure.

Recognizing Maher's substantial assistance and extraordinary cooperation, including providing testimony at two trials despite the devastating consequences for his family relations, the government has moved pursuant to U.S.S.G. § 5K1.1 for a 12-level downward departure.  Acceptance of the government's motion will, by itself, reduce the offense level to 11 (if the Obstruction Adjustment is not applied, as addressed below) or at most 13 (even with the Obstruction Adjustment).

Independently, the probation officer recommends an 18-level downward departure under § 2B1.1 based on the unique circumstances of Maher's offense conduct and because the offense level determined under that guideline substantially overstates the seriousness of his offense.  That "recommendation is made without [Maher's] cooperation taken into account."  (PSR at 28.)  In making that recommendation, the PSR notes that:

> Pursuant to USSG §2B1.1, comment, (n.20(c)), there may be cases in which the offense level determined under this guideline substantially overstates the seriousness of the offense.  In such cases, a downward

1
2
3

departure may be warranted.  The guideline calculations are driven by the gain in this case, which was enjoyed entirely by the other co-conspirators, many of whom the defendant did not know existed.  While the defendant was the initial source of the inside information, there is no evidence that defendant himself made any trades based upon this information.

4

(PSR at 28–29.)

5

A number of courts have questioned the utility of gain calculations in measuring

6

culpability and determining appropriate sentences in insider trading cases.  *See, e.g.*,

7

*Gupta*, 904 F. Supp. 2d at 351 ("By making a Guidelines sentence turn, for all practical

8

purposes, on this single factor, the Sentencing Commission effectively ignored the

9

statutory requirement that federal sentencing take many factors into account, and, by

10

contrast, effectively guaranteed that many such sentences would be irrational on their

11

face.") (citation omitted); *see also United States v. Corsey*, 723 F.3d 366, 378–79 (2d

12

Cir. 2013) (Underhill, J., concurring) (recognizing "widespread perception that the loss

13

guideline is broken[, leaving] district judges without meaningful guidance in high-loss

14

[fraud] cases"); *United States v. Emmenegger*, 329 F. Supp. 2d 416, 427 (S.D.N.Y. 2004)

15

(criticizing the "excessive weight on [the fraud loss] factor" and noting that loss is a

16

"relatively weak indicator of the moral seriousness of the offense or the need for

17

deterrence").

18

Indeed, because the insider trading guideline relies on the § 2B1.1 loss table for

19

the theft guideline, it ignores that trading gain is not always a rational indicator of the

20

degree of culpability and therefore can "substantially overstate[] the seriousness" of a

21

defendant's—and particularly a tipper's—offense.  *See* U.S.S.G. § 2B1.1 cmt. n.20(C).

22

The emphasis on tippees' trading gains fails to take into account the specifics of the

23

tipper's conduct, including the presence or absence of financial benefit to the tipper, as

24

well as the fact that, in most cases, the tipper has no control over either the scope of the

25

trading by tippees or the gain realized by their trading.  For example, a tipper who was

26

paid for information or engaged in extensive trading of his or her own is treated the same

27

as a tipper who, like Maher here, received nothing more than an intangible relationship

28

benefit, did not engage in or control any trading, was not in charge of running the

1    scheme, and did not share or seek to share in any proceeds of the trading.  Under

2    analogous circumstances in a pre-*Booker* case, the court in *United States v. Oakford*

3    *Corporation*, No. 98-CR-144 (JSR), 1999 WL 1201725, at *10–11 (S.D.N.Y.

4    Dec. 13, 1999), granted a 13-level downward departure where the offense level for each

5    defendant was increased 15 levels based on a $15 million gain calculation, but where

6    "each of the defendants personally realized only a small portion of the overall gain or

7    profits."  *See also United States v. Kalili*, 100 F. App'x 903, 906 (4th Cir. 2004)

8    (affirming similar downward departure to defendant who did not significantly profit from

9    co-defendant's forged check scheme where loss guideline overstated seriousness of

10   offense).

11          Here, Maher did not benefit financially from Michael's trading and had no

12   knowledge about the volume, type, or value of Michael's trades, or that Michael shared

13   material nonpublic information with others.  The gain amount does not therefore reflect a

14   more culpable mental state or make Maher's offense more wrongful than if fewer, less

15   profitable trades had been made and unfairly inflates the guidelines range in the

16   circumstances of this case.  This is particularly true given the extenuating emotional

17   circumstances under which Maher reluctantly provided Michael the Biosite tip, which

18   accounts for the majority of the trading gain.

19          Based on the 18-level downward departure recommended by the probation officer

20   without taking Maher's cooperation into account, whether or not the Obstruction

21   Adjustment is included, the adjusted guidelines level for Maher would be less than 8 and

22   place him in Zone A, with a sentencing range of 0 to 6 months.  Taking into account the

23   12-level § 5K1.1 downward departure requested by the government for Maher's

24   substantial assistance, the adjusted level would be in Zone A (offense level of 1 to 8)

25   even if the § 2B1.1 downward adjustment for circumstances noted by the PSR were only

26   3 levels (assuming no Obstruction Adjustment) or only 5 levels (assuming an Obstruction

27   Adjustment) instead of 18 levels.  The Sentencing Guidelines analysis therefore supports

28

1  a probationary sentence without home confinement for Maher even without regard to any

2  variance based on other § 3553(a) factors.

3                    **2.      The Obstruction Adjustment does not apply**

4           As noted in the PSR, the draft PSR did not include a two-level increase for

5  obstruction.  (PSR at 25.)  While the final PSR added that adjustment based "upon the

6  Government's assertion that the defendant's conduct obstructed the investigation as

7  defined in the guidelines," the PSR "defers to the Court in interpreting case law presented

8  by the parties regarding the applicability of this adjustment."  (*Id.* at 26.)  As

9  demonstrated below, that case law does not support application of the Obstruction

10  Adjustment in this case.

11                    **a.      The Scope of the Obstruction Adjustment**

12          Section 3C1.1 provides:

13          If (1) the defendant willfully obstructed or impeded, or attempted to
            obstruct or impede, the administration of justice with respect to the
14          investigation . . . of the instant offense of conviction, and (2) the
            obstructive conduct related to (A) the defendant's offense of conviction
15          and any relevant conduct; or (B) a closely related offense, increase the
            offense level by 2 levels.
16

17  U.S.S.G. § 3C1.1.  To the degree the Obstruction Adjustment applies to unsworn false

18  statements, it focuses on whether a defendant, by actively making material false

19  representations—and not by passively denying involvement or refusing to cooperate and

20  admit guilt—succeeds in significantly obstructing or impeding an investigation.  The

21  official commentary to section 3C1.1 establishes that it does not apply to false statements

22  not under oath that (1) consist of denials of guilt or an "exculpatory no"; or (2) do not

23  significantly impede or obstruct the investigation or prosecution.

24                    **(i)      The "exculpatory no" exclusion for false
                                 statements not under oath**
25

26          The application notes to section 3C1.1 explain that the Obstruction Adjustment

27  does not apply to "[a] defendant's denial of guilt (other than a denial of guilt under oath

28  that constitutes perjury)[.]"  U.S.S.G. § 3C1.1 cmt. n.2.  Section 3C1.1 is "designed to

1    avoid applying an obstruction increase for a mere 'exculpatory no,' where a defendant

2    denies guilt or conceals his crime during police questioning." *United States v. Griffin*,

3    310 F.3d 1017, 1023 (7th Cir. 2002); *see also United States v. Surasky*, 976 F.2d 242,

4    244–45 (5th Cir. 1992) (defendant's false statements to investigator that he had nothing

5    to do with and knew nothing about attempted prison escape were "fairly described as a

6    mere 'denial of guilt' within the meaning of U.S.S.G. § 3C1.1"); *United States v. Fiala*,

7    929 F.2d 285, 289–90 (7th Cir. 1991) (defendant's false statement to state trooper that he

8    had nothing illegal in his car, which in fact contained marijuana, "was no more than a

9    denial of guilt, and as such, falls squarely within [the denial of guilt] exception"); *United*

10   *States v. Barnett*, 939 F.2d 405, 407 (7th Cir. 1991) (defendant's false statement to postal

11   inspector that she had invested money rather than fraudulently kept it for herself was "no

12   more than a denial of guilt") (internal quotations and citation omitted).

13                    **(ii)     Requirement that false statements not
                                 under oath significantly obstruct or
14                               impede the investigation or prosecution**

15            The application notes to section 3C1.1 provide examples of conduct that the

16   Obstruction Adjustment does and does not cover.[4]  Examples of covered conduct include,

17   among others, threatening a witness or juror, committing or suborning perjury,

18   destroying evidence, and providing materially false information to a judge or a

19   magistrate.  U.S.S.G. § 3C1.1 cmt. n.4.  Covered conduct also includes "providing a

20   materially false statement to a law enforcement officer that *significantly obstructed or*

21   *impeded the official investigation or prosecution* of the instant offense."  *Id.* at § 3C1.1

22   cmt. n.4(G) (emphasis added).

23            The application notes clearly establish that the Obstruction Adjustment does not

24   apply to false statements not under oath unless they significantly obstruct or impede the

25   ───────────────
     [4] The commentary to section 3C1.1 also makes clear that there is *not* a presumption in
26   favor of an obstruction adjustment absent a separate count of conviction for obstruction.
     *See* U.S.S.G. § 3C1.1 cmt. n.5.  Maher was never charged with conspiracy to commit
27   obstruction under 18 U.S.C. § 371 or obstruction under 18 U.S.C. § 1505.  (*See* ECF No.
     1 at 15–18.)

28

1  investigation or prosecution. Specifically, conduct *not* covered includes "making false

2  statements, not under oath, to law enforcement officers, unless [the statements

3  'significantly obstructed or impeded the official investigation or prosecution']." *Id.* at

4  § 3C1.1 cmt. n.5(B), 4(G).

5       Thus, for unsworn false statements to justify application of the Obstruction

6  Adjustment, there must be "a causal relationship between the materially false statement

7  given and a resulting impediment upon the instant investigation or prosecution." *Griffin*,

8  310 F.3d at 1023. The adjustment applies, for example, if unsworn false statements

9  caused investigators to "go on a wild goose chase" or led them on a misdirected

10  investigation. *United States v. Ahmed*, 324 F.3d 368, 373 (5th Cir. 2003) (internal

11  quotations omitted).[5]

12       The government carries the burden of showing significant and actual obstruction

13  or impediment. *See, e.g.*, *United States v. Shriver*, 967 F.2d 572, 575 (11th Cir. 1992)

14  (holding that the government "failed in its burden to establish that [defendant's unsworn

15  false statements to an IRS inspector] significantly obstructed the official investigation");

16  *United States v. Pham*, 545 F.3d 712, 720 (9th Cir. 2008) ("The government has the

17  burden of proving the facts necessary to support a sentence enhancement by a

18  preponderance of the evidence."). The "*potential* for . . . statements to have impeded the

19  investigation, rather than evidence of *actual* impediment or hindrance," is insufficient.

20  *United States v. Hanhardt*, 361 F.3d 382, 390 (7th Cir. 2004) (emphasis added), *vacated

21  on other grounds sub nom. Altobello v. United States*, 543 U.S. 1097 (2005); *see also*

22  *United States v. Solano-Godines*, 120 F.3d 957, 964 (9th Cir. 1997) (obstruction

23  _____

24  [5] *See also United States v. Smith*, 203 F.3d 884, 891 (5th Cir. 2000) (applying adjustment where defendant's "statement went far beyond merely denying her own involvement or refusing to provide information, which would not qualify for the obstruction

25  enhancement" and "sent . . . investigators on the trail of unknown suspects, whom she specifically described in order to obstruct the investigation into her own and her co-

26  conspirators' involvement"); *United States v. Soto*, 399 F. App'x 498, 507 (11th Cir. 2010) (applying adjustment where defendant intentionally misidentified a person, which

27  caused investigators to expand scope of investigation).

28

1   adjustment requires actual and significant hindrance and is not warranted where

2   defendant merely attempts to hinder investigation).

3                    **b.      Maher's unsworn false statements were**
                              **"exculpatory no" denials of guilt and did not**
4                             **significantly obstruct or impede the**
                              **government's investigation**
5

6        The only conduct relied on by the government to support application of the

7   Obstruction Adjustment is the unsworn false statements that Maher made during his

8   May 1, 2007 telephone interview with the SEC.  (Excerpts from transcript attached as

9   Exhibit A ("SEC Tr.").)  In that unannounced phone call with SEC representatives,

10  Maher denied knowing about the Biosite and USPI transactions before they were

11  publicly announced (SEC Tr. at 5:7–6:24; 8:13–9:18; 28:19–29:4), denied sharing

12  material non-public information with his brother (*id*. at 20:9–17), and denied that he

13  would learn about transactions that Citigroup worked on if he was not personally

14  involved, except on rare occasions (*id*. at 22:19–24).

15       Those unsworn false statements (1) were "exculpatory no" denials of guilt (*see*

16  U.S.S.G. § 3C1.1 cmt. n.2); and (2) did not "significantly obstruct[] or impede[] the

17  official investigation or prosecution" (*see id*. § 3C1.1 cmt. n.4(G)).  For each of these

18  independent reasons, the Obstruction Adjustment should not be applied here.

19                   **(i)     Maher's false statements during the**
                              **phone interview were "exculpatory no"**
20                            **denials of guilt.**

21       As noted above, when "a defendant denies guilt or conceals his crimes" in

22  response to questioning by law enforcement authorities, this "exculpatory no" does not

23  justify application of the Obstruction Adjustment.  *See Griffin*, 310 F.3d at 1023.

24       In *Barnett*, for example, the defendant, Barnett, who pled guilty to mail and wire

25  fraud, had kept for herself insurance proceeds that the victim had entrusted with Barnett

26  to invest.  When first confronted by postal inspectors, "Barnett reported that she had

27  invested $25,000 of [the victim's] money with her 'people' in New Mexico."  939 F.2d at

28  406.  Only later did she "admit[] that she had lied" and confess that "she had given

SENTENCING MEMORANDUM                                                              39
Case No.  09-CR-00417-EMC

1    $25,000 to an accomplice and had kept $10,000 for herself." *Id.*  The Seventh Circuit,

2    reversing the district court on a finding of clear error, held that "Barnett's initial

3    statement to investigators 'was no more than a denial of guilt, and as such, falls squarely

4    within [the "exculpatory no"] exception to the obstruction of justice enhancement.'" *Id.*

5    at 407 (quoting *Fiala*, 929 F.2d at 290).

6         Similarly, in *Surasky*, the defendant, who pled guilty to attempted escape from

7    custody, had "stated when questioned that he knew nothing about the escape attempt, nor

8    had he seen or heard anything."  976 F.2d at 245 (internal quotations omitted).

9    Reversing the district court's application of the Obstruction Adjustment as clearly

10   erroneous, the Fifth Circuit held that the defendant's statements were "fairly described as

11   a mere 'denial of guilt' within the meaning of U.S.S.G. § 3C1.1."  *Id.*

12        Like the false statements at issue in *Barnett* and *Surasky*, Maher's unsworn false

13   statements in the SEC phone interview were denials of guilt that fall squarely within the

14   "exculpatory no" exclusion.  When questioned about providing insider tips to his brother,

15   Michael, Maher denied (1) having material non-public information about the transactions

16   at issue or other transactions that he had not worked on; and (2) discussing material non-

17   public information with Michael.  To do otherwise would have been to admit guilt.

18   Maher did not affirmatively offer any false information or attempt to misdirect the

19   government's investigation.  As plainly provided in the official commentary, the

20   Obstruction Adjustment is not intended to apply to this kind of "denial of guilt (other

21   than a denial of guilt under oath that constitutes perjury)."  U.S.S.G. § 3C1.1 cmt. n.2.

22                        **(ii)**     **Maher's unsworn false statements did not**
                                    **significantly obstruct or impede the**
23                                  **government's investigation.**

24        Even if Maher's unsworn false statements made during the SEC phone interview

25   were more than just denials of guilt, they would not justify application of the Obstruction

26   Adjustment since they did not "significantly obstruct[] or impede[] the official

27   investigation or prosecution."  *Id.* at § 3C1.1 cmt. n.4(G).  Unlike false statements

28   justifying application of the adjustment, they did not cause investigators to "go on a wild

goose chase," *Ahmed*, 324 F.3d at 373 (internal quotations omitted); send investigators

on a false "trail of unknown suspects," *Smith*, 203 F.3d at 891; or cause investigators to

expand their investigation through a misidentification or false lead, *Soto*, 399 F. App'x at

507.  Maher "merely den[ied] [his] own involvement" and "refus[ed] to provide

information," conduct that does "not qualify for the obstruction enhancement." *Smith*,

203 F.3d at 891.

    *Ahmed*, which considered the Obstruction Adjustment with regard to analogous

statements, is instructive.  The defendant in that case, Ahmed, was charged with

harboring illegal aliens—certain sailors who had jumped ship and entered the United

States illegally.  Ahmed had transported the sailors to a motel where he had booked

rooms in his name.  When the FBI questioned Ahmed, he denied knowing the sailors.

324 F.3d at 369–70.  The district court held that this was a materially false statement that

impeded the investigation, justifying the Obstruction Adjustment.  *Id.* at 371.

    The Fifth Circuit held that this was clear error and reversed.  The court noted, first

of all, that "Ahmed's denials of knowing the sailors could possibly qualify under

Application Note 2 of § 3C1.1 which states that '[a] defendant's denial of guilt (other

than a denial of guilt under oath that constitutes perjury) . . . is not a basis for application

of this provision.'"  *Id*. at 372.  The court went on to hold that the statements did not

"significantly impede[] the investigation."  *Id*. at 373.  It found that:

> [T]here is absolutely no evidence that Ahmed's statements caused the FBI
> agents to go on a "wild goose chase," or in any other way misled the
> agents in the sort of manner that has traditionally been the basis for
> enhancement.  Rather, the FBI had to go forward with their investigation
> as they normally would, *i.e.*, continue searching for and tracking down
> possible leads as to the sailors whereabouts.

*Id*.  The court rejected the government's argument that "[h]ad Mr. Ahmed cooperated in

the beginning, [the FBI] would not have had to track down the rest of the leads that they

did have to go to."  *Id*. at 373–74 (internal quotations omitted).  It found that "the

government's argument . . . seeks to punish Ahmed not for impeding the investigation,

but for not aiding the investigation."  *Id*. at 374.

1    Similar to the government's argument in *Ahmed*, the government has suggested

2    here that Maher's denial in the SEC interview that he learned about transactions that

3    Citigroup worked on but that he was not personally involved in except rarely (SEC Tr. at

4    22:19–24) caused investigators to spend time interviewing Maher's Citigroup colleagues

5    to establish that information about deals they were working on was shared on more than

6    rare occasions.  As was true of the defendant's statements in *Ahmed*, however, "there is

7    absolutely no evidence that [Maher's] statements caused the FBI agents to go on a 'wild

8    goose chase,' or in any other way misled the agents in the sort of manner that has

9    traditionally been the basis for enhancement.  Rather, the FBI had to go forward with

10   their investigation as they normally would."  324 F.3d at 373.

11   Indeed, a truthful admission that he acquired information about Citigroup

12   transactions that he was not personally working on more than rarely would not have

13   obviated in any way the government's need to interview Maher's colleagues about the

14   transactions at issue.  At the time of the SEC call, SEC and DOJ investigators knew that

15   there were suspicious patterns of trading by Michael—including trading timed to

16   transactions that involved Citigroup but not Maher personally, *e.g.*, Biosite and USPI,

17   which were subjects of specific questioning during the interview.  Whether or not

18   Citigroup investment bankers were rarely or more often privy *in general* to information

19   about deals they did not work on personally, the government needed to establish that

20   Maher had access to information about *those specific deals*.  To do that required

21   interviews with those who worked on the deals and scrutiny of communication records

22   between them and Maher.  The determination that communications among Citigroup

23   investment bankers about their pending transactions occurred more than rarely, in

24   general, was neither necessary nor sufficient for the investigation, which needed to

25   establish that Maher had access to information regarding the *particular stocks that were*

26   *the subject of the insider trading investigation*.  That Maher had information regarding

27   Biosite and USPI could not be presumed from any general practice among Citigroup

28   investment bankers.

1     Moreover, Maher knew the information that he passed on to Michael about

2  Biosite not because of general sharing of information within Citigroup about pending

3  transactions, but only because he happened to attend a lunch at which reference was

4  made to the Biosite transaction; and he knew the information that he shared about USPI

5  only because his personal friendship with the Citigroup banker working on the

6  transaction made him privy to the fact that his colleague was working on a potential deal.

7  Maher was also asked during the SEC interview the more pertinent questions—did he

8  have information about Biosite and USPI—and denied that he did.  (*See* SEC Tr. at 5:7–

9  9, 8:23–25.)  But denials in answer to specific questions of this kind clearly fall within

10  the "exculpatory no" exclusion and do not justify application of the Obstruction

11  Adjustment.

12     Like the agents' questions in *Ahmed*, the government's inquiries about general

13  sharing of information within Citigroup were really a general version of a more specific

14  question that fell within the "exculpatory no" category.  As the Fifth Circuit explained in

15  *Ahmed*:

16     [T]he FBI agents never asked Ahmed where the sailors were, only if he
      knew them.  Though it is true that the question they asked was probably
17     preliminary to them asking where the sailors were, it is hard to conceive
      how Ahmed's statement that he didn't know the sailors could have created
18     an additional impediment to the investigation.  Even if the FBI agents had
      asked Ahmed if he knew where the sailors were located, as we have
19     already stated, a negative response to this question would have qualified as
      a denial of guilt.
20

21  324 F.3d at 374.

22     Here, it is similarly hard to conceive how Maher's statement that Citigroup

23  investment bankers did not generally share information about deals impeded the

24  investigation more than Maher's specific denials that he had information about the deals

25  at issue, including Biosite and USPI.  And his specific denials of having relevant

26  information qualify as denials of guilt similar to Ahmed's hypothetical denial of

27  knowledge of the location of the sailors.  As discussed above, the Obstruction

28  Adjustment has not been applied to denials of this kind, but rather to affirmative

misinformation that creates an unnecessary and unfruitful avenue of investigation.  As in *Ahmed*, application of the Obstruction Adjustment here would, in effect, "punish [Maher] not for impeding the investigation, but for not aiding the investigation."  *Ahmed*, 324 F.3d at 374.

***

For these reasons, the Obstruction Adjustment does not apply in this case. Maher's unsworn false statements in his SEC phone interview (1) were denials of guilt subject to the "exculpatory no" exclusion to the Adjustment; and (2) did not significantly impede or obstruct the investigation by suggesting or requiring avenues of investigation that would not have been otherwise necessary.  Maher therefore respectfully urges the Court to calculate his offense level without the Obstruction Adjustment.

**F.      Any Pertinent Policy Statement Issued by the Sentencing Commission**

Maher is unaware of any pertinent policy statements issued by the Sentencing Commission.

**G.      The Need to Avoid Unwarranted Sentence Disparities**

The goal of avoiding unwarranted sentencing disparities remains a key sentencing factor.  *See United States v. Ressam*, 679 F.3d 1069, 1094 (9th Cir. 2012); *see also* 28 U.S.C. § 991(b)(1)(B) (purposes of Sentencing Commission include "avoiding unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct while maintaining sufficient flexibility to permit individualized sentences when warranted by mitigating or aggravating factors not taken into account in the establishment of general sentencing practices").  As discussed below, in Maher's case, a probationary sentence is required to avoid unwarranted disparities with sentences imposed on defendants guilty of similar or more egregious misconduct in comparable insider trading cases, as well as with the sentence imposed on his brother Michael.

### 1.    Defendants in comparable insider trading cases

A custodial sentence for Maher would be disproportionate to sentences in comparable insider trading cases.  An analysis of sentences given to 112 defendants in comparable insider trading cases[6] over the last six years supports a probationary sentence for Maher, particularly given his unique reasons for participating in the insider trading scheme here, his lack of any personal financial gain from the trading, and his extraordinary cooperation with the government's investigation.  Attached as Exhibit B is a chart that summarizes the sentences of the 112 defendants (including tippers, tippees, and individuals who aided the alleged insider trading scheme) who have been sentenced since 2009.  Attached as Exhibit C is a chart that summarizes the comparable insider trading cases.

Looking first at defendants most comparable to Maher, of the 49 defendants who pleaded guilty and cooperated with the government's investigation,[7] 33 (67.35%) received a probationary sentence, and 10 of the 17 cooperating insider tipper defendants (58.82%)[8] received a probationary sentence:

---

[6] To identify comparable insider trading cases, we searched for cases that met all of the following criteria:  (1) the case involved an investment banker or other professional with access to material nonpublic information; (2) the case involved a tipper-tippee relationship; (3) the case involved more than one insider trading transaction that resulted in significant profits.  For a more complete comparison, we include in our discussion cases where the tipper defendant entered a plea of guilty and cases where the tipper defendant was convicted after trial.  To identify cases, we searched publicly available sources, including:  news stories, Department of Justice and Securities and Exchange Commission press releases, and case law and dockets on Westlaw and LexisNexis.  We believe therefore that our search has resulted in a reasonably complete survey of comparable cases.

[7] These defendants are *italicized* in Exhibits B and C.

[8] Insider tipper defendants include defendants who, like Maher, were investment bankers or other professionals with access to material nonpublic information and provided confidential information to others in breach of their fiduciary duties.  The insider tipper defendants who cooperated with the government's investigation are *underlined and italicized* in Exhibits B and C.

| Sentence | Number (and %) of Cooperators Who Received Sentence | Number (and %) of Cooperating Insider Tippers Who Received Sentence |
|---|---|---|
| Probationary | 33 (67.35%) | 10 (58.8%) |
| Imprisonment, less than or equal to 1 year | 7 (14.29%) | 1 (5.88%) |
| Imprisonment, more than 1 year | 9 (18.37%) | 6 (35.29%) |

Maher's conduct and cooperation compare favorably with that of other cooperating insider tipper defendants who have received probationary sentences. Like Mark Anthony Longoria and Daniel DeVore,[9] for example, whose substantial assistance was largely based on testifying, or preparing to be a witness, at the trials of other members of alleged insider trading schemes, Maher provided key testimony at both Mr. Bayyouk's and Mr. Salman's trials. In addition, as discussed above, Maher's wife, Susie, testified as a government witness at Mr. Bayyouk's trial and provided information to aid the government's preparation when she was subpoenaed by defense counsel to testify at her brother's trial. Both Longoria and DeVore were sentenced to two years' supervised release. At DeVore's sentencing, Judge Jed Rakoff noted that defendants (like Maher) who have provided "vital assistance" and displayed remorse have avoided prison time and "all of that applies totally to [DeVore] and warrants a sentence not involving incarceration."[10] Longoria and DeVore received probationary sentences despite being paid for the material nonpublic information they disclosed in breach of their fiduciary duties. As discussed above, Maher in contrast did *not* benefit financially from and did not intend to benefit financially from disclosing confidential information to Michael.

---

[9] The guideline calculation in DeVore's case was somewhat lower (offense level 14) because of a lower loss calculation, but the calculation in Longoria's case was identical to that which we believe is applicable here (offense level of 23).

[10] Nate Raymond, *Ex-Dell employee avoids prison for help in insider trading probe*, Reuters (Dec. 5, 2013), http://www.reuters.com/article/2013/12/05/us-insidertrading-dell-idUSBRE9B41AC20131205.

1       Other cooperating insider tippers whose conduct was more culpable than Maher's

2  have nonetheless also received probationary sentences.  Anil Kumar, for example, was a

3  senior consultant at McKinsey & Co. who participated in an insider trading scheme over

4  a six-year period.  Kumar repeatedly violated his fiduciary and other duties of

5  confidentiality to McKinsey and its clients by disclosing confidential information to Raj

6  Rajaratnam, a friend from business school.  Unlike Maher, Kumar provided tips in

7  exchange for money (approximately $1,700,000 and several hundred thousand dollars in

8  profits in Galleon funds over the course of the scheme) and the prospect of future

9  business opportunities.  Kumar also traded on at least one occasion on inside information

10  given to him by Rajaratnam, who made more than $23,000,000 in illicit profits from

11  Kumar's information.  Rajiv Goel, an executive at Intel, also provided Rajaratnam with

12  material nonpublic information about Intel and certain third parties in exchange for

13  money.  Rajaratnam conducted trades in Goel's Charles Schwab account based on other

14  inside information and made approximately $700,000 to $800,000 in illegal profits for

15  Goel in that account.  Rajaratnam made approximately $2,800,000 in illegal profits from

16  the information provided by Goel.  Kumar and Goel testified at Rajaratnam's trial, and

17  Kumar also testified at Rajat Gupta's trial.  Both were ultimately sentenced to two years

18  of supervised release.[11]

19       The relevant conduct of the six cooperating insider tipper defendants who

20  received a sentence of more than one year in prison[12] was far more culpable than

21  Maher's.  In addition to providing material nonpublic information to others, Nicos

22  Stephanou, an investment banker who received 19 months' imprisonment,[13] personally

---

23  [11] The guidelines calculations for Kumar (offense level 21) and Goel (offense level 23)
24  were comparable to that in this case.

25  [12] These defendants include Nicos Stephanou; King Chuen Tang; Eric Martin; Richard
    Posey; John Lazorchak; and Mark Cupo.

26  [13] Stephanou, who was not a U.S. citizen, was arrested when he entered the United States
27  and served 19 months in pre-trial detention before making bail, which also may account
    for his 19-month sentence (of "time served").

28

1    traded on inside information that he obtained from his employers and their clients over an

2    approximately 10-year period, making approximately $973,000 in illegal profits.

3    Similarly, King Chuen Tang, a CFO at a private equity fund who received one year and

4    one day of imprisonment, provided material nonpublic information about clients to others

5    and also personally traded on the inside information, as well as information he received

6    from his brother-in-law.  Along with his co-conspirator tippees, Tang's insider trading

7    scheme earned approximately $5,600,000 in illegal profits.  Both Stephanou and Tang,

8    unlike Maher, also played a role in organizing and directing the insider trading schemes

9    in their cases.[14]

10          Eric Martin, a director and vice president at a publicly traded company who

11    received 24 months' imprisonment, provided material nonpublic information about his

12    company to others who hired him as an outside consultant over an approximately five-

13    year period in exchange for stock tips about other public companies and business and

14    networking opportunities.  After Martin left his company, Richard Posey, a vice president

15    at the same company, continued to provide Martin material nonpublic information about

16    the company.  Posey was sentenced to 15 months' imprisonment.  Unlike Maher, both

17    Martin and Posey also personally traded on the inside information during company

18    blackout periods.  Martin's illegal trading and tipping of others between 2005 and 2010

19    resulted in over $7 million in insider trading gains and losses avoided; and Posey's illegal

20    tipping of Martin between 2009 and 2010 resulted in over $5 million in insider trading

21    gains and losses avoided.[15]

22          John Lazorchak and Mark Cupo, both directors at different publicly traded

23    companies, were the primary architects of an insider trading scheme that netted over

24    $1.4 million in profits over an approximately five-year period.  Lazorchak, Cupo, and

25    ─────────────────────
      [14] The guidelines calculations for Stephanou (offense level 27) and Tang (offense level
26    25) were higher than that in this case.

27    [15] The guidelines calculations for Martin (offense level 24) and Posey (offense level 24)
      were higher than that in this case.

28

1   another defendant each tipped material nonpublic information about their companies to a

2   non-trading middleman who provided the information to others to avoid detection.

3   Unlike Maher, Lazorchak and Cupo, who were both sentenced to 16 months'

4   imprisonment, were compensated for the information they provided through cash

5   payments made in installments to avoid scrutiny of large cash withdrawals.[16]

6         Unlike these cooperating insider trading defendants who received custodial

7   sentences, Maher did not personally trade on the inside information he shared with his

8   brother, did not financially benefit from the illegal trading, and did not play a role in

9   organizing and directing the insider trading scheme—indeed, he knew nothing about the

10  specifics of Michael's trading or sharing of information with others.

11        The conduct of Brien Santarlas, a corporate attorney who received six months'

12  imprisonment, is similarly distinguishable from Maher's.  Santarlas expected and

13  received compensation in exchange for providing material nonpublic information about

14  his law firm's clients.  Further, Judge Richard Sullivan recommended that "in light of the

15  length of [Santarlas's] sentence and the nonviolent nature of the offense . . . [Santarlas]

16  be considered for designation at a halfway house or home confinement."[17]

17        The nine (non-insider-tipper) cooperators who received time in prison,[18] unlike

18  Maher, each directly obtained personal profits from her or his conduct; had prior criminal

19  history;[19] or provided cooperation that did not rise to the level of substantial assistance.[20]

20  
21  [16] The guidelines calculations for Lazorchak (offense level 23) and Cupo (offense level 23) were comparable to that in this case.

22  [17] Judgment (ECF No. 15) in *United States v. Brien Santarlas*, No. 09-CR-1170 (RJS) (S.D.N.Y. Dec. 1, 2011).

23  
24  [18] These cooperating defendants include Frank Burgess, Jr.; Roomy Khan; Kenneth Raby; Joseph Seto; Bryan Shaw; Sean Stokke; Aaron Wens; Roger Williams; and Zisen Yu.

25  
26  [19] Khan, for example, was not initially completely forthcoming nor truthful with the government about the extent of her past criminal activities and those of others; she also engaged in conduct that obstructed the government's investigation into her co-conspirators.  Khan also fell into criminal history category II because of a prior wire fraud conviction related to her actions in obtaining material nonpublic information through her job at Intel and providing it to Raj Rajaratnam.

27  
28

1    Maher received no personal profits, has no criminal history, and has provided substantial

2    assistance as recognized by the government's § 5K1.1 motion.  Against this backdrop, a

3    custodial sentence for Maher would be disproportionate.

4         As the sentences and cases summarized in Exhibit B and Exhibit C demonstrate,

5    defendants who (1) orchestrated or concocted the scheme; (2) financially benefitted from

6    the scheme or intended to do so; (3) failed to accept responsibility for their criminal

7    behavior and were convicted at trial; (4) did not cooperate with the government's

8    investigation; (5) destroyed evidence or otherwise significantly impeded the

9    government's investigation; or (6) had prior criminal histories, were more likely to

10   receive a custodial sentence.  None of these factors applies to Maher.

11        Comparison to sentencing of similarly situated cooperating insider tipper

12   defendants in comparable cases thus supports recommendation of a probationary

13   sentence for Maher.  Indeed, in Maher's case, as in *Gall*, the imposition of a sentence of

14   imprisonment "may work to promote not respect, but derision, of the law if the law is

15   viewed as merely a means to dispense harsh punishment without taking into account the

16   real conduct and circumstances involved in the sentencing."  552 U.S. at 54 (internal

17   quotation and citation omitted).  Given that probationary sentences have a considerable

18   punitive effect, as discussed above and recognized by the Supreme Court in *Gall*,

19   552 U.S. at 48–49, a probationary sentence is more than enough punishment to reach a

20   just result here.

21                    **2.    Michael Kara**

22        Another relevant baseline that the Court should consider in determining an

23   appropriate sentence for Maher is the probationary sentence with condition of six

24   months' home confinement recently imposed on his co-conspirator and brother, Michael.

25   ────────────────────────────────

     (Footnote continued from previous page.)

26   [20] The government acknowledged Stokke's willingness to cooperate, but noted in its
     sentencing memorandum that it was not necessary to secure the conviction of his co-
27   conspirator and thus apparently did not make a 5K1.1 motion for a downward departure.

28

Using Michael's sentence as a benchmark, a probationary sentence without home confinement is appropriate to give full credit to Maher for his lesser culpability and extraordinary cooperation and to avoid an unwarranted disparity between his and Michael's sentences.

As the PSR acknowledges, Michael was more culpable than Maher in the insider trading scheme:

> [T]here is no evidence that [Maher] himself made any trades based upon [the inside] information. He was aware that some of the information he was provided was being used by Michael Kara, but he was unaware that Michael was passing along information and instructions to others. Importantly, [Maher] did not profit from his insider trading, and he was the only individual involved in the scheme who lost his employment as a result of the offense.

(PSR at 24.) Indeed, Michael, unlike Maher, engaged in a sophisticated, multi-year insider trading scheme in which he deliberately deceived Maher about his trading and use of material nonpublic information and made millions of dollars for himself and numerous tippees. When Maher did provide material nonpublic information to Michael knowing that Michael would trade on it, Maher did so under the emotional stress of Michael's persistent prodding and pleas for help in the context of Michael's long history of erratic and unpredictable behavior, addiction, and mental health issues, including bipolar disorder that had led to apparently suicidal depression after their father's untimely death from cancer. Maher provided Michael that information with no idea of the scope of the resulting trading by Michael and others. A lesser sentence for Maher is therefore appropriate.

## H.     There Is No Need for a Period of Home Confinement.

As demonstrated above, a period of home confinement is unnecessary to fulfill any of the § 3553(a) sentencing goals. Further, Maher, unlike Michael, lost his career and has been unemployed for more than six years. Home confinement would unnecessarily burden Maher's ability to commit to full-time employment and build a new career now that his cooperation and sentencing are finally complete. He should be able

1    to move on with his life without the constraints that the fact of home confinement or any

2    resulting limitations might impose.

3           **I.      There Is No Need to Provide Restitution to Victims of the
              Offense.**

4

5           The government does not seek restitution from Maher, and the PSR

6    acknowledges that restitution by Maher, who received no proceeds from the illegal

7    trading, would not be appropriate.  (PSR ¶ 22.)  Even if restitution is due to alleged

8    victim Citadel,[21] no liability should be apportioned to Maher under 18 U.S.C. § 3664(h)

9    since there is no evidence that Maher engaged in Biosite trading or received Biosite

10   trading profits (or any insider trading profits) of any kind.  (*See* PSR ¶ 95 ("[T]here is no

11   evidence that the defendant himself made any trades based upon [inside information].").)

12          **III.    OBJECTIONS TO PRESENTENCE REPORT**

13          Other than the Obstruction Adjustment guidelines issue addressed above, Maher

14   has no objections to the PSR.

15          **IV.     CONCLUSION**

16          Under all the circumstances of this case and the analysis of the § 3553(a)

17   sentencing factors set forth above, including downward Guidelines departures

18   recommended by the government and the probation officer, a three-year probationary

19   sentence for Maher, without condition of home confinement, as recommended by the

---

20   [21] We do not believe that Citadel, a large hedge fund, has shown entitlement to restitution
     here.  "Under the MVRA, restitution 'may be awarded only for losses for which the
21   defendant's conduct was an actual *and* proximate cause.'"  *United States v. Swor*,
     728 F.3d 971, 974 (9th Cir. 2013) (quoting *United States v. Kennedy*, 643 F.3d 1251,
22   1261 (9th Cir. 2011)).  An alleged victim has the burden therefore to "show not only that
     a particular loss would not have occurred but for the conduct underlying the offense of
23   conviction, but also that the causal nexus between the conduct and the loss is not too
     attenuated (either factually or temporally)."  *Swor*, 728 F.3d at 974 (internal quotations
24   and citations omitted).  We are aware of no evidence that Citadel would not have made
     the same sales and suffered the same losses but for the trading by Michael and his
25   tippees, which represented a very small portion of the 3,000 Biosite contracts traded on
     March 23, 2007.  *Cf. United States v. Tyler*, 767 F.2d 1350, 1351–52 (9th Cir. 1985).
26   And even if trading by Michael and his tippees was the but-for cause of Citadel's losses,
     those losses were too attenuated from Maher's conduct for that conduct to be the
27   proximate cause of the losses.

28

1  PSR, is both reasonable and appropriate.  Such a sentence would recognize the

2  seriousness of Maher's offense while acknowledging his full and extraordinary

3  cooperation, remorse, and acceptance of responsibility.  Maher has already suffered

4  substantial consequences that make imprisonment or home confinement unnecessary.

5  Prior to his offense, he led a life distinguished by industriousness, integrity, and kindness

6  toward others, and he has the determination and ability to move forward with his life in a

7  positive and hopeful way.  As Maher writes:

> I owe a great deal to not only my family and friends, but to society as a whole.  Everything I took for granted I see now as a privilege, and I am instilling those values in my children.  Your Honor, more than anything, I want to make up for the seven years of misery and shame I have brought to my family.  My mother, wife, children and friends deserve so much more than what I have delivered.  I hope you can grant me the ability to move forward with my life and embark on a path where I can make you, my family and society as a whole proud of my efforts.

(Letter from Maher Kara.)

For the reasons set forth herein, Maher Kara respectfully requests a sentence of three years' probation with no home confinement.

Dated:  December 15, 2014

Respectfully submitted,

MORRISON & FOERSTER LLP

/s/ *George C. Harris*
GEORGE C. HARRIS

GEORGE C. HARRIS
GHarris@mofo.com
JUSTIN D. HOOGS
JHoogs@mofo.com
425 Market Street
San Francisco, California 94105-2482
Telephone:  (415) 268-7000
Facsimile:  (415) 268-7522

CARL H. LOEWENSON, JR.
CLoewenson@mofo.com
250 West 55th Street
New York, NY 10019-9601
Telephone:  (212) 468-8000
Facsimile:  (212) 468-7900

Attorneys for Defendant
MAHER F. KARA